THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
MICHAEL FREDERICK DENT, DEFENDANT-APPELLANT.

THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. HARVEY FRANKLIN, DEFENDANT-APPELLANT.

Argued February 20, 1968—Decided May 6, 1968.

430

*Mr. Jeremiah D. O'Dwyer* argued the cause for appellant Michael Frederick Dent (*Mr. Peter Murray,* Public Defender of New Jersey, attorney).

*Mr. Robert L. Sheldon* argued the cause for appellant Harvey Franklin (*Mr. Peter Murray,* Public Defender of New Jersey, attorney).

*Mr. Joseph A. Hoffman,* Assistant Attorney General, argued the cause for respondent (*Mrs. Virginia Long Annich,* Deputy Attorney General, on the brief; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. Defendants were charged with the robbery-murder of Benjamin Caruso at his home in Plainfield, New Jersey, in the early morning hours of August 7, 1966. On April 20, 1967, a jury found them guilty of first degree murder. The verdict not being accompanied by a recommendation of life imprisonment, the trial court imposed the death penalty. Both defendants have appealed therefrom directly to this Court under *R. R.* 1:2–1(c).

I.

At the trial the State offered proof showing that between 1-3 A.M. on August 7, 1966, John E. Davis and defendants Michael Frederick Dent and Harvey Franklin entered the home of Benjamin Caruso for the purpose of stealing. Davis was a juvenile, aged 17; Dent and Franklin were over 18; their exact ages do not appear in the record. Caruso

awakened and began to shout, at which Dent and Franklin subjected him to a brutal beating about the head and body as the result of which he died in about an hour. Franklin took about $90 and a metal heater from the house. His palm print was found on the heater when the police recovered it. Apparently Dent appropriated a metal tool box and some gloves. The articles and the money were brought across the street to Davis' parents' home where Davis lived, and hidden in the cellar. The stolen money was divided equally, each of the three receiving somewhat in excess of $30. They then went to sleep in the cellar for several hours, and left the Davis home between 10 A.M. and 11 A.M.

When the victim was discovered dead in his home he was naked, except for a piece of cloth which, according to the police, was found loosely tied around his neck. A second piece of the material was picked up in the Davis home by a police officer. Examination of the two pieces by the chief chemist and toxicologist for the New Jersey State Police revealed that they came from the same cloth.

At the trial the State produced Rochelle Eure, a 19-year-old friend of Davis and of the two defendants. Eure testified that on Sunday afternoon, August 7, 1966, around 1:30, Davis, Dent and Franklin were in the street in front of the Davis home throwing a football around. He was with them but was not participating in the game. In the course of conversation Dent and Franklin "mentioned something about a guy" and "some kind of punches." They demonstrated "as if they — a fight or something." Dent said something about "a left hook." At the prosecutor's request the witness assumed a boxing stance to show how Dent and Franklin demonstrated the action to him. Eure testified also that, although nothing was said during this conversation and demonstration about the other person in the fight, either Dent or Franklin "nodded" in the direction of a house on the opposite side of the street. The plain inference from the record is that the house indicated was that of the decedent Caruso.

The State's principal witness was John Davis, one of the three actors in the criminal event. Prior to this trial he had been charged in the Juvenile Court with juvenile delinquency arising out of the robbery, and aiding and abetting the murder of Caruso. Following admission of guilt he was sentenced to an indeterminate imprisonment term in the Annandale Reformatory. He was still in confinement there at the time of the trial. On being called to the stand he refused to say anything. The jury was excused and the trial judge rejected a plea of the Fifth Amendment, pointing out that he had already been sentenced on the case against him. After some stern questioning by the judge, Davis asked to see his parents and his attorney. A recess was taken which lasted three hours during which time he talked to his attorney and parents. The trial resumed and the transcript of the intervening events and questioning was read to the jury. On retaking the stand Davis explained his original attitude by saying he was nervous and wanted his parents present. He then proceeded to testify.

Davis said he was with Dent and Franklin in the early morning of Sunday, August 7, 1966. They had been "out" together. Around 1:00 a.m. he told them that Michael Caruso, who lived across the street from his parents, had some money. All three then walked around Caruso's house to see how they could get in. Franklin and Dent went in through a window. Davis did not go in that way. He said he remained outside for a time. Then he heard "hollering" and went into the house by means of the back door. He said he only went into one room and did not see Caruso. He remained about five minutes, during which time he went through some drawers and papers looking for money. Then he left with Franklin and Dent. The tool box, heater, gloves and the money were taken with them. He could not remember if he carried any of these things. The articles were brought to his parents' home and hidden in the basement. The money was divided. Franklin, in Dent's presence, told him that Caruso had awakened and started to shout.

When he refused to be quiet they beat him and "knocked him out."

Davis corroborated Eure's testimony about the Sunday afternoon conversation. He said that in Eure's presence he, together with Franklin and Dent talked about breaking into the Caruso home, stealing the money and articles and beating Caruso.

At the conclusion of this testimony, defense counsel suggested to the trial judge that he had treated Davis harshly until the agreement to testify was reached. They claimed that from then on the judge "mellowed" and treated him in a very considerate fashion. They urged that this change prejudiced defendants with the jury because it indicated to the jury that the judge believed the witness. Thereupon, at their request, the judge turned to the jury and advised them that whatever his attitude was or seemed to have been, it was "in no way an indication as to whether or not his testimony is to be accepted by you. That's entirely within your power. It was not my intention by any indication of my attitude to take a position. * * * The truth of his testimony is for you to decide." Although no objection was noted to this statement, and no request for further elucidation was made, defendants claim on this appeal that the instructions did not remove the prejudicial impression that the jury must have had from the court's treatment of Davis. There is no merit in the contention. The judge's intervention to induce the witness to testify was a matter of discretion in the emergent situation. His forthright statement to the jury, at counsel's request, with respect to the purpose of that intervention was adequate, in our judgment, to neutralize any possible prejudice to defendants.

But in charging the jury respecting Davis' testimony the trial court fell into reversible error. The jury was told that Davis was a critical witness for the State, having admitted his own participation in the crime and asserting that the defendants were active participants with him. Then, in accordance with *State v. Spruill*, 16 *N. J.* 73 (1954),

they were instructed that since Davis was an accomplice "his testimony should be given close scrutiny to determine whether or not he was influenced by any hope of advantage from his testimony or any fear which affected his truthfulness." The language of the charge immediately following, in our judgment, dissipated the force of that statement. The court said:

"In view of the fact that Davis has admitted his guilt and has been sentenced as a juvenile, there does not appear, on the surface at least, to be any advantage that he can gain from testifying for the State. Whether or not he had any such hope I cannot tell. Whether he had any fear from the State if he did not testify for the State, I don't know."

As the court had pointed out, Davis was the State's most important witness. Although the defendants did not testify, his credibility was sharply in issue. For his admitted part in the robbery and murder he had been given an indefinite reformatory sentence. The length of his stay there depended upon many factors that involve exercise of discretion by those in charge of the reformatory. *N. J. S. A.* 30:4–148. It is not unreasonable to suppose, certainly not unreasonable for defense counsel to suggest and argue, that Davis had been promised or given some indication by representatives of the State that if he cooperated by testifying against Dent and Franklin the length of his term would be shortened. In fact, the courts have recognized that when an accomplice is presented by the State as a witness against his confederates and he testifies fully and truthfully, he thereby obtains an equitable or moral claim to some leniency. *State v. Edelman,* 19 *N. J. Super.* 350, 353 (*App. Div.* 1952) ; *State v. Grundy,* 136 *N. J. L.* 96, 98 (*Sup. Ct.* 1947) ; *State v. Graham,* 41 *N. J. L.* 15 (*Sup. Ct.* 1879). Defendants developed on cross-examination that the assistant prosecutor had been to see Davis at Annandale on at least two occasions prior to the trial. Davis said the assistant prosecutor had told him he was going to be brought to court, and they

went over his trial testimony together. His parents also came to see him there and told him he was going to be brought to court to testify. He acknowledged also that his father had told him during the trial recess, after he had refused to testify, that he would spend a longer time in jail if he did not tell his story. Moreover, defense counsel argued in summation to the jury that Davis was expecting a shorter term at Annandale in return for his testimony.

Under the circumstances, the possibility of reward in the form of a shorter stay at Annandale in return for cooperative testimony against the defendants was a legitimate matter for consideration by the jury in evaluating Davis' credibility. His testimony being of paramount importance to the State's case, it was natural and expected that the defense in cross-examining him and in summation would stress the possibility or actuality of agreement by the State to reward him by cutting his incarceration at Annandale in return for testimony favorable to the prosecution. Defendants realized that if the jury believed Davis there was no chance of acquittal. Consequently any comment by the court on Davis' credibility in its charge to the jury undoubtedly took on added significance. As indicated by the exerpt from the charge quoted above, the court in effect answered defendants' suggestion of reward for Davis and probably eliminated it from the jurors' minds as a factor to be considered in measuring his credibility. The language of the charge told the jury that since Davis had admitted his guilt and had been sentenced as a juvenile, the matter was ended for him and so "there does not appear, on the surface at least, to be any advantage that he can gain from testifying for the State." That statement was not only incorrect, but had to affect detrimentally defendants' attack on Davis' truthfulness. Since as a matter of statute his term at Annandale rested in the discretion of the Board of Managers, *N. J. S. A.* 30:4–148, it was fairly arguable even "on the surface" that he might gain some advantage by cooperating with the State. The court's intrusion into the subject had the clear capacity to make the

jury believe that defendants' attack on Davis, based on his alleged hope of a lessened reformatory term, had no substance. In this connection one cannot ignore the fact that the "trial judge is an imposing figure"; or that "to the jurors he is a symbol of experience, wisdom and impartiality." See *State v. Guido*, 40 *N. J.* 191 (1963). When he intervenes substantially, so as to suggest probable lack of substance in an attack upon a vital witness' credibility, the impact may be critical.

After the charge to the jury had been completed, defendants objected to the portion under attack here. They specifically pointed out that Davis' sentence to the reformatory was indeterminate and that its length might be affected by his cooperation with the State at this trial. The trial judge replied he did not consider the suggestion reasonable. He had never heard of it "but within [his] knowledge [the board is] not affected by that." So he found no merit in defendants' objection. We cannot agree. As indicated above, the criticized portion of the charge may well have virtually eliminated from jury consideration an important and material factor bearing upon the truthfulness of this vital witness' testimony. For that reason the judgment must be reversed.

It is worth noting also that this reversible error was compounded by the further treatment given in the charge to the issue of Davis' credibility. This portion followed immediately after the prejudicial language just discussed.

When the homicide was committed Davis was 17 years old. Although his age brought him within the jurisdiction of the Juvenile and Domestic Relations Court, the judge of that court, in his discretion after hearing, could have referred the case to the prosecutor for treatment in the same manner as an adult criminal homicide case, if he was satisfied that Davis was an habitual offender or that the offense was of a heinous nature. *N. J. S. A.* 2A:4–15; *State v. Van Buren*, 29 *N. J.* 548 (1959).

Davis knew that if his case was handled in the juvenile court he could not be executed or given a specific sentence of life imprisonment. It appeared on cross-examination that for the first few days after his arrest he did not give the police a statement concerning the murder. He conceded, however, that his first statement was given after he had been informed he would be treated as a juvenile and his case retained in the juvenile court. Defense counsel argued in summation that Davis' statement and his testimony involving Dent and Franklin were unworthy of belief because they were given either upon agreement by the State, or at least in an effort by Davis, to keep the complaint against him in the juvenile court, thus saving him from exposure to the death penalty in an adult criminal court. This was a legitimate attack upon Davis' credibility.

In its charge the court read to the jury the text of the statute (*N. J. S. A.* 2A:4–15) under which the juvenile court judge has discretion in a case such as the present one to retain it in his court, or for the reasons stated above to refer it to the prosecutor for disposition in the adult criminal tribunal. The charge then continued:

"I think the meaning of that is fairly clear. It means that in the first instance any juvenile, anyone under the age of eighteen years who commits an act, which in the case of a person over eighteen years of age would constitute a crime, must be prosecuted in the Juvenile Court for juvenile delinquency. If he is to be transferred for criminal prosecution to this court it must be either on his own request or it is upon a determination by the Judge of the Juvenile and Domestic Relations Court.

Now I don't know exactly what the suggestion is with respect to this subject but if it is intended to suggest that the police, the prosecutor or his lawyer made him any promise about it, any such promise was beyond their power. Whatever the police or the prosecutor may want to do they can't do anything else than prosecute in the Juvenile Court firstly. And as to transferring the case, the only person who can decide that it should be transferred to this Court from the Juvenile Court is the Judge of the Juvenile Court. And I may add that Judges are not inclined to let the police or the prosecutor tell them what to do about questions like that. * * *"

The effect of the quoted language, particularly in view of what had just gone before, was to disparage thoroughly the attack on Davis' credibility and to throw the impressive weight of the court in support of his truthfulness. An objection was entered to this part of the charge also. Defense counsel said that at least a statement should have been included indicating that juvenile court judges are "disposed to listen to recommendations from the law enforcement agencies, particularly recommendations with respect to the treatment to be afforded a State's key principal witness who has testified as to his complicity and who has implicated two others." And when counsel criticized the court's statement as indicating the juvenile court judge "had the whole control here," and "doesn't listen to anybody," the court replied: "He certainly has, and I will stand by it." Without deciding whether this latter portion of the charge, of itself, would warrant reversal of the conviction, undoubtedly it heightened the error contained in the erroneous support that had already been given to Davis' credibility.

■ Moreover, as a practical matter, as we observed in *State v. Taylor,* 49 *N. J.* 440 (1967) there is nothing inherently unholy in honest plea bargaining between the prosecutor and defendant and his attorney. "At times it is decidedly in the public interest." This does not mean that the prosecutor can commit the judge to any particular sentence or action. But he may recommend a form of treatment or leniency, and it is fair to say that the court in its discretion, after being made aware of the full situation, would ordinarily give due consideration to such recommendation. 49 *N. J.*, at *p.* 455. True, the record in this case contains no affirmative proof of any actual promise of leniency by the prosecutor to Davis in return for his testimony against Dent and Franklin. But the claim that such inferences may be drawn from the evidence is not so unreasonable as to justify depriving defendants of their probative force by a destructive charge with respect to them.

## II.

As set forth earlier, neither of the defendants testified in his defense. There were no eyewitnesses to the crime, no admissions of guilt except from Davis and Eure, and there was no proof in the case to show that a single witness was available to defendants to prove that they were at some other place and not at the scene of the crime in the early morning of Sunday, August 7, 1966. So far as the record goes presumably they were the only ones who could offer such proof.

On this aspect of the case the court advised the jury that defendants had a constitutional right to be silent, that "they [were] not required to testify in their own behalf, and they are not to be penalized for the exercise of their constitutional rights." But farther along during the discussion of Davis' credibility, the charge continued:

"One of the things you may consider in weighing the truth of the evidence produced for the State is the absence of any witness for the defendants to say that Franklin and Dent were not at the Caruso home in the early hours of August 7, 1966. No witness that I can recall testified that they were somewhere else asleep in bed or doing something else. You may consider that.

Davis's testimony is uncontradicted as the evidence stands. * * *"

An objection was made to this latter statement on the ground that it contradicts "the presumption of innocence," and "the constitutional right not to testify"; "everything going in favor of the defendants is negated by making a comment of that kind." In our view the objection was well taken. If the record showed there were witnesses other than defendants themselves who had personal knowledge of defendants' whereabouts when the homicide was committed, the court's statement might pass muster. But since there was no such proof, the consequence of the charge was to direct the attention of the jury to the failure of the defendants to testify in their own behalf. Such focusing of

attention was inescapably prejudicial. It invaded their absolute Fifth Amendment right to remain silent without suffering any penalty or adverse inference. *Griffin v. State of California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. ed.* 2d 106 (1965) ; *Malloy v. Hogan,* 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. ed.* 2d 653 (1964) ; *State v. Lanzo,* 44 *N. J.* 560, 563 (1965). In effect the jury was told that from the failure of the defendants to deny from the witness stand their presence at the scene of the crime, the inference could be drawn that defendants could not truthfully deny either it or the killing.

Unless it appears that there are witnesses other than the defendant available to contradict or deny evidence inculpating him, a comment of the type made here by the court of necessity points to the only person who could have offered the denial, *i. e.,* the defendant himself. In such situation the potential for prejudice is so great that an appellate tribunal must regard the defendant's Fifth Amendment rights as having been subjected to unlawful trespass. See *State v. Sinclair,* 49 *N. J.* 525, 548-49 (1967) ; *State v. McElroy,* 96 *N. J. Super.* 582, 584-85 *(App. Div.* 1967) ; *State v. Persiano,* 91 *N. J. Super.* 299, 301 *(App. Div.* 1966) ; *Flaherly v. United States,* 355 *F.* 2d 924, 926 *(1st Cir.* 1966) ; *Desmond v. United States,* 345 *F.* 2d 225 *(1st Cir.* 1965) ; *Barnes v. United States,* 8 *F.* 2d 832 *(8th Cir.* 1925) ; *Linden v. United States,* 296 *F.* 104 *(3d Cir.* 1924) ; *Shea v. United States,* 251 *F.* 440 *(6th Cir.), certiorari* denied, 248 *U. S.* 581, 39 *S. Ct.* 132, 63 *L. ed.* 431 (1918) ; *People v. Wollenberg,* 37 *Ill.* 2d 480, 229 *N. E.* 2d 490, 494 (1967) ; *Commonwealth v. Richard,* 211 *Pa. Super.* 55, 233 *A.* 2d 603 *(Super. Ct.* 1967) ; Annotation, 14 *A. L. R.* 3d 723 (1967). This is particularly so where the comment may have played a substantial role in producing the death penalty.

It is no answer to say that the court in another portion of the charge told the jury about defendants' constitutional right to be silent at their trial, and that their failure to speak from the witness stand could not be used against them. The objectionable language was inconsistent with the

general reference to the Fifth Amendment privilege. A jury could not be expected to decide for itself which statement of the law was correct.

The criticized language carried another improperly prejudicial import. Its tendency was to water down the basic presumption of defendants' innocence, and to shift the State's burden of proof. The implication conveyed by the court was that the defendants had a duty to prove they were not at the scene of the crime, but in fact were "somewhere else asleep in bed or doing something else." The instruction is susceptible of the interpretation that defendants were under a duty to prove an alibi of some kind, and their failure to do so could be turned against them.

## III.

Defendants claim also that certain remarks of the prosecutor on his opening to the jury were designed either to put pressure on them to take the witness stand in their defense or to prepare the jury to draw inferences unfavorable to them if they did not do so.

The prosecutor said:

"The defendants at this point have put in a defense of not guilty. They do not have to tell me what their defense is, and so when you hear it I will hear it for the first time as well."

Later in his opening, the prosecutor continued:

"Ladies and gentlemen, when I am finished the defendants, if they so desire, will tell you what they have to say, and whatever they say and you hear I too will hear for the first time."

Defendants liken these statements to the assistant prosecutor's opening in *State v. Pickles*, 46 *N. J.* 542, 579 (1966) which we declared improper because it had the tendency to cut down on the scope of the accused's Fifth Amendment protection. In *Pickles* the assistant prosecutor told the jury that only one person could furnish answers. That person was

the defendant because he was the only one at the scene of the crime and only he "can give us certain answers." We were satisfied in that case that such statement put improper pressure on a defendant to testify, and inevitably gave rise to inferences adverse to him when he remained silent.

In the present case the prosecutor denies that any such motivation produced his remarks. His position is that he was thinking only of defense counsel's opening to the jury, which would follow immediately after the State concluded. We agree that his remarks were not comparable to those in *Pickles* from the standpoint of possible prejudice to the defendants. The difference is sufficiently marked to dissuade us from the view that reversible error should be predicated upon them.

We deal with the question primarily to caution against comments by prosecutors in opening and closing which may adversely affect an accused's Fifth Amendment rights. At the present time the area is an extremely sensitive one. Most of the cases cited above in connection with our review of the trial court's comment about the absence of any witness for the defendants, involved remarks by the prosecutor in his summation which either in subtle or obvious fashion drew attention to the accused's failure to testify. See *e. g., State v. McElroy, supra; State v. Persiano, supra; Barnes v. United States, supra;* Annotation, 14 *A. L. R. 3d, supra* at 730. Remarks which skirt the edges of impermissible comment are neither desirable nor worth the risk of reversal of what may well be a thoroughly deserved conviction. *Cf. Kitchell v. United States,* 354 *F. 2d* 715, 718–719 (*1st Cir.*), *certiorari* denied, 384 *U. S.* 1011, 86 *S. Ct.* 1970, 16 *L. Ed. 2d* 1032 (1966). Caution is desirable until the constitutional boundaries of permissible comment on the state of the evidence when the accused does not testify are thoroughly established. In the meantime the sensible course is to assume that jurors can see as well as hear, and do not have to be told when evidence is uncontradicted.

## IV.

We have examined the other grounds of error raised by defendants and find no further basis for reversal. With regard to some of the prosecutor's questions about the defendants' lack of employment at the time of and after the homicide, the State should be mindful of *State v. Mathis*, 47 *N. J.* 455, 472 (1966).

## V.

The convictions are reversed for the reasons outlined above and the case is remanded for retrial.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL and SCHETTINO—5.

*For affirmance*—None.