253 N.J. Super. 346 (1992)
601 A.2d 1162
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
JULES ROBINSON, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
JAMES GORMAN, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued and Submitted November 4, 1991.[1].
Decided January 21, 1992.
*349 Before Judges J.H. COLEMAN, BILDER and STERN.
Robert L. Sloan, Assistant Deputy Public Defender, argued the cause for appellant Jules Robinson (Wilfredo Caraballo, Public Defender, attorney; Robert L. Sloan, of counsel and on the brief).
Wilfredo Caraballo, Public Defender, attorney for appellant James Gorman (Katherine F. Graham, Designated Counsel, of counsel and on the brief).
Deborah A. Siegrist, Assistant Prosecutor, argued the cause for respondent (Stephen G. Raymond, Burlington County Prosecutor, attorney; Deborah A. Siegrist, of counsel and on the brief in A-1799-89T4, State v. Jules Robinson, and of counsel and on the brief in A-1840-89T4, State v. James Gorman).
The opinion of the court was delivered by STERN, J.A.D.
Defendants Jules Robinson and James Gorman were indicted with Denise Bugyi for armed robbery, N.J.S.A. 2C:15-1a(2) (count one), and aggravated assault, N.J.S.A. 2C:12-1b(4) (counts two and three). Bugyi entered a guilty plea and testified for the State at the joint trial of Gorman and Robinson *350 (defendants). At the conclusion of the State's case defendants successfully moved to have count three, alleging aggravated assault by pointing a firearm at Carl Middleton, dismissed. Defendants were both thereafter found guilty of armed robbery and the remaining charge of aggravated assault involving Bruce Forrester.
After the trial judge denied Robinson's motion for a new trial based on newly discovered evidence, the judge denied the State's request that both defendants be sentenced to mandatory extended terms as second Graves Act offenders under N.J.S.A. 2C:44-3d. The judge merged count two, the aggravated assault charge, into count one, the armed robbery charge, and sentenced both defendants to eighteen years with a six year period of parole ineligibility.
On this appeal Gorman argues:
POINT I DEFENDANT'S CONVICTION FOR FOURTH DEGREE AGGRAVATED ASSAULT SHOULD BE VACATED (NOT RAISED BELOW).
POINT II THE TRIAL JUDGE COMMITTED PLAIN ERROR IN FAILING SUA SPONTE TO ACQUIT DEFENDANT FOR AGGRAVATED ASSAULT UNDER R. 3:18-1, 3:18-2, AND 3:20. (NOT RAISED BELOW).
POINT III THE PROSECUTOR'S COMMENTS MADE IN SUMMATION HAD THE CLEAR CAPACITY TO DEPRIVE DEFENDANT OF A FAIR TRIAL. (PARTIALLY RAISED BELOW).
POINT IV DEFENDANT WAS DENIED HIS RIGHT TO A SPEEDY TRIAL.
POINT V THE TRIAL COURT'S INSTRUCTIONS TO THE JURY RESULTED IN REVERSIBLE ERROR BECAUSE IT RELIEVED THE STATE OF ITS BURDEN TO PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT. (NOT RAISED BELOW).
POINT VI DEFENDANT IS ENTITLED TO HAVE HIS SENTENCE AND PAROLE ELIGIBILITY CALCULATED IN A MANNER CONSISTENT WITH N.J.S.A. 2C:44-5b(2) AND THE APPLICABLE CASE LAW.
POINT VII DEFENDANT WAS DENIED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL IN THAT COUNSEL UTTERLY FAILED TO INVESTIGATE, PREPARE AND DEVELOP DEFENDANT'S APPROPRIATE APPLICATION FOR ALMOST 945 DAYS OF "GAP-TIME CREDITS" UNDER RICHARDSON V. NICKOLOPOULOS.

POINT VIII THE TRIAL COURT ABUSED ITS DISCRETION IN (1) FAILING TO ADDUCE SUFFICIENT EVIDENCE TO SUPPORT ITS FINDINGS OF AGGRAVATING FACTORS (2) DENYING THE APPLICABILITY OF *351 MITIGATING FACTORS AND (3) FAILING TO APPROPRIATELY WEIGH THE AGGRAVATING AND MITIGATING FACTORS.
Robinson contends:
POINT I THE TWO YEAR DELAY FROM DEFENDANT'S ARREST UNTIL THE COMMENCEMENT OF TRIAL VIOLATED HIS RIGHT TO A SPEEDY TRIAL. U.S. CONST.AMENDS. VI, XIV; N.J. CONST. (1947), ART. I, PAR. 10.
POINT II THE TRIAL JUDGE'S REFUSAL TO REINSTRUCT THE JURORS ON THE SPECIAL CREDIBILITY PROBLEMS RELATED TO ACCOMPLICE TESTIMONY DENIED DEFENDANT THE RIGHT TO A FAIR TRIAL; U.S. CONST.AMENDS. VI, XIV; N.J. CONST. (1947) ART. I, PARS. 9, 10.
POINT III THE DENIAL OF DEFENDANT'S MOTION FOR A NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED EVIDENCE DEPRIVED HIM OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST.AMENDS V, VI, XIV; N.J. CONST. (1947), ART. I, PARS. 1, 9, 10.[2]
By timely cross appeals the State challenges the denial of its request that defendants be treated as second offenders under the Graves Act.
Our careful review of the record convinces us that the contentions raised on the appeals and cross appeals lack merit *352 and do not warrant extended discussion, R. 2:11-3(e)(2), except as noted herein.

I.
The denial of defendants' motions for dismissal of the indictment on speedy trial grounds is affirmed substantially for the reasons stated by Judge Martin L. Haines in his letter opinion of March 20, 1989.

II.
We briefly recite the facts relevant to an understanding of the critical issues arising from the trial and motion for new trial. On January 9, 1987 at about 9:00 p.m. Bruce Forrester and Carl Middleton, both employees of Consumer Electronics in Maple Shade, travelled in separate cars to the Blason office of the First Fidelity Bank in Moorestown to make a night deposit of the day's proceeds. Forrester was carrying the deposit bag that day. As he was about to make the deposit Forrester noticed someone standing "in front of [his car] door." The man demanded the money and pointed a gun at Forrester's head from a distance of about 10" to a foot. Forrester handed over the deposit bag which contained about $1,300.00 in cash and checks. Thereafter Forrester's car began to roll backward because Forrester had neglected to put the car in park while waiting for Middleton. The assailant moved in front of the car and fired the gun. Forrester then saw the assailant, later identified as Robinson, "stumbl[e] around" while facing Forrester and looking at the gun. Then the assailant fled "through the field and towards [an] office complex."
Middleton, who was in his car behind the Forrester vehicle, "observed a man sitting on a curb near the bank drop" as they pulled up. Middleton saw the man approach Forrester's car and "put a gun to his head". Middleton heard the man demand the money and saw Forrester hand the bank bag over to him. Middleton then observed the man walk 10-15 feet to the front *353 of Forrester's car, turn, fire a shot and flee toward the adjacent field.
When responding police officers arrived at the scene, Sergeant Naylor discovered a .25 calibre automatic shell casing underneath the drive-in roof. Forrester and Middleton provided the police with formal statements. Middleton also assisted a police artist prepare a composite sketch of the robber the next day.
At approximately 10:30 p.m. the evening of the robbery, Paul Vallee, the manager of a Domino's Pizza store located near the First Fidelity Bank, observed a man enter the store and allowed him to make two telephone calls. Following the first call, a cab arrived and then departed without the man. Vallee thereafter allowed him to make another call. Subsequently a "silver or blue Trans Am or Firebird arrived with two occupants" to pick the man up. One of the occupants of the car was a female. Vallee could not identify the man in a photo array two months later.
At trial Forrester testified that Gorman had worked for Consumer Electronics from November 12, 1986 to December 24, 1986. He further stated that Gorman was familiar with the bank drop routine because he had participated as a "tagalong" in making bank deposits while employed at Consumer Electronics.
On February 8, 1987 Detective John Bratton of the Moorestown Township Police Department received a call from a detective in Mantua Township who advised Bratton that he had a witness in custody with information related to the robbery. Bratton and Lieutenant Howard Mann travelled to the Mantua Police Department and met Detective Gramlam of Mantua and Denise Bugyi. Bugyi subsequently provided Bratton with information regarding the crime, pled guilty and testified for the State at trial.
Denise Bugyi testified that she met Gorman on Christmas eve, 1986, through her ex-boyfriend, Fred Rouse, who was *354 defendant Gorman's nephew. According to Ms. Bugyi, on January 9, 1987 about 7:30 p.m. she received a phone call from Gorman who asked her to drive "him and Jules to Consumer Electronics where he used to work [t]o rob the bank bag." She picked up Gorman in her blue 1985 Trans Am and was then directed by Gorman to "Jules' house," a room at the Ambler Motel in Brooklawn. The three then drove to a parking lot "across the street" from Consumer Electronics where they waited for Consumer Electronics employees to leave the store. As the employees left the store, Bugyi drove to the bank where Robinson, who had received a "small handgun" from defendant Gorman, was "dropped off". Bugyi and Gorman drove to a nearby "alley way" where Robinson was told to meet them. Gorman subsequently "got out of the car and walked to the back of the alley" to see what was happening at the bank.
According to Bugyi, about two minutes later Gorman ran back to the car and advised Bugyi that "he heard the gun go off." He further said that the gun was not supposed to go off because it was "broke or something."
As Robinson did not return to the location where they were to meet, she and Gorman drove around looking for him. Eventually Bugyi and Gorman drove back to Robinson's motel and asked his girlfriend if Robinson had returned. They then drove to Gorman's house where they received information that Robinson had called and was waiting for them at the Domino's Pizza. Bugyi and Gorman then drove to the pizzeria where they picked up Robinson between 10:30-11:00. Ms. Bugyi noted that Robinson appeared "upset and nervous because the gun had gone off". Both defendants were surprised the gun had fired and defendant Robinson remarked, "[m]an I could have shot that guy".
Bugyi further testified that Robinson told Gorman and her that after the robbery he dropped the gun in the woods and subsequently set the bank bag "down somewhere." He didn't know if anything was in it. Gorman unsuccessfully searched *355 for the bag while Robinson, fearing identification, remained in the car. Subsequently Bugyi dropped Robinson off and then took Gorman home where no party was ongoing. A few days later Bugyi and Gorman with "Arlene" again searched for the bank bag which they could not find.
Ms. Bugyi testified that sometime later she received a call from Rouse, her boyfriend and father of her child, who was then at the Mantua police station. He asked Bugyi to come to the station and "tell them about the armed robbery." According to Bugyi, someone was trying "to pin him" with the January 9 robbery while a suspect in an unrelated matter. She went to Mantua to advise the police that "Fred Rouse didn't do it."
On her cross examination, Bugyi admitted that she pled guilty to the indictment for the January 9, 1987 transaction and to other unrelated offenses in exchange for an indeterminate sentence as a result of which she "could do no more than five years" instead of a 60 year exposure. She hoped to obtain a lesser sentence if she did well as a witness at trial. Her sentence had been adjourned pending the results of her testimony.
Bugyi's pretrial statement concerning the robbery enabled the police to show Middleton a photographic lineup containing defendant Robinson's picture. Middleton selected the picture from a photo array of about eight photos presented to him. Middleton testified at trial that his selection of defendant Robinson's photograph was based on "probability," and that he assumed that the suspect's picture would be among them. Neither Middleton nor Forrester was able to identify Robinson at trial.
On February 13, 1987 the police located the bank bag in the bushes near the bank. They never recovered the gun.
Gorman produced an alibi witness who testified that on January 9, 1987 she threw a birthday party for her boyfriend, Rouse, and that defendant Gorman spent the entire evening of *356 January 9, 1987 at the party and may have been out of her presence only 1/2 hour. She also testified that she also had a child by Rouse and that she "can't stand" Denise Bugyi.

III.
We reject Gorman's contention with respect to the aggravated assault that the State failed to prove that he acted "knowingly under circumstances manifesting extreme indifference to ... human life", as required by N.J.S.A. 2C:12-1b(4), because he gave co-defendant Robinson a gun which defendant Gorman believed to be "`broke' or inoperable". As an accomplice in the armed robbery, independent of the fact he gave Robinson the "firearm," (see N.J.S.A. 2C:39-1f) with which it was accomplished, Gorman was responsible for Robinson's conduct with it. See N.J.S.A. 2C:2-6; State v. Schmidt, 213 N.J. Super. 576, 517 A.2d 1226 (App.Div. 1986), rev'd other grounds, 110 N.J. 258, 540 A.2d 1256 (1988).[3]

IV.
Gorman argues that the prosecutor made "prejudicial" and "inflammatory" remarks in her summation and that this error was compounded by the failure of the trial judge to give the jury the proper curative instructions. Gorman objects to the prosecutor's statement during summation that "[a] shot was fired in the direction of Carl Middleton and Bruce Forrester". Later the prosecutor stated "[a] shot was fired in the direction of both of them".
It is true that there was no evidence that the gun was pointed towards Middleton or fired at him. However, the third count of the indictment was dismissed before summations, and when *357 defendant objected to the latter statement, the judge stated before the jury that "[t]he pointing of the gun at Carl Middleton is out of the case. Therefore there can't be any argument about that".
Furthermore, the trial judge's charge to the jury contained instructions that it had to rely on its own findings based on its recollection of the evidence and carefully pointed out the nature of the charges and that the jury had to find that the aggravated assault was caused by pointing the gun at Forrester.
In essence, "we cannot say the prosecutor's comments were so inflammatory as to deny defendant a fair trial." State v. Tirone, 64 N.J. 222, 229, 314 A.2d 601 (1974).

V.
Robinson argues that his conviction must be reversed because of the judge's instructions and lack of instructions concerning Ms. Bugyi. It is true, as Robinson argues, that in State v. Dent, 51 N.J. 428, 241 A.2d 833 (1968), the Supreme Court held that a trial court's comment that a juvenile accomplice, who testified for the State while serving his indeterminate sentence, had nothing to gain by that testimony, was reversible error. Id. at 434-438, 241 A.2d 833. Here, however, the trial judge did not inject any statement as to whether Bugyi had something to gain by testifying for the State. To the contrary, he told the jury that "[t]he law requires that the testimony of such a witness be given careful scrutiny. In weighing her testimony, therefore, you may consider whether she has a special interest in the outcome of the case and whether her testimony was influenced by the hope or expectation of any favorable treatment or reward or by any feelings of revenge or reprisal." Further, the judge's failure to recharge the jury on the credibility of an accomplice witness, in response to a question from the jury to recharge on the subject of credibility, did not violate the Dent rule. Moreover, the jury subsequently asked for various other readbacks over the next day and *358 indicated its awareness to request further instructions if it desired them. Hence, the jury instructions and lack of them do not warrant reversal.

VI.
The State concedes that Gorman is entitled to "gap time" credits under N.J.S.A. 2C:44-5b(2). However, the State opposes defendant's entitlement to "gap time" credits against his parole ineligibility term. We agree. See Richardson v. Nickolopoulos, 110 N.J. 241, 254-255, 540 A.2d 1246 (1988).

VII.
On its cross-appeal, the State contends that the trial court erred in not imposing the extended term required by N.J.S.A. 2C:44-3d. We disagree. In State v. Martin, 110 N.J. 10, 538 A.2d 1229 (1988), the Supreme Court held that, before an extended term for a second Graves Act violation can be imposed, the prosecutor at a hearing must provide a copy of the prior conviction, transcripts of testimony, or other proofs demonstrating that the defendant used a "firearm" during the commission of the prior crime. Id. at 18, 538 A.2d 1229. Because there can be a question as to whether a "firearm," as defined by N.J.S.A. 2C:39-1f, was involved in the prior transaction[4], the burden is on the State to prove prior use or possession of a "firearm." Id. at 16-18, 538 A.2d 1229. The Title 2A prior convictions (under N.J.S.A. 2A:151-5) here were not for offenses which had to involve use or possession of a "firearm," see State v. Jefimowicz, 119 N.J. 152, 158, 574 A.2d 428 (1990), and the prosecutor did not produce the proofs required by Martin. See also N.J.S.A. 2C:43-6h.
*359 On the first date scheduled for sentencing, July 10, 1989, the trial judge noted that the prosecution offered only previous "indictments that charge violations of the law that include the armed feature". The judge rejected the sufficiency of those proofs and extended an opportunity to the prosecution to present further proofs, over the defendant's objection, at a later date. Before sentencing defendants on October 27, 1989, the judge again found, in the absence of further proofs, that the State had not met its burden of proving a prior Graves Act offense. He therefore properly declined to impose a mandatory extended term on the record presented.
Because of the mandatory nature of the extended term for a second Graves Act offense, we remand for reconsideration of the sentence. On the remand, the State should be permitted to present additional proofs if the court concludes, upon consideration of the issue, that there are no due process or double jeopardy preclusions because the sentence was initially fixed in the absence of proofs relating to the prior offenses. See and compare, e.g., Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981); State v. Koedatich, 118 N.J. 513, 524, 572 A.2d 622 (1990) (death penalty before jury); State v. Martin, supra (remand after extended term initially set). See also, e.g., North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); State v. Rodriquez, supra; State v. Stewart, 96 N.J. 596, 605-608, 477 A.2d 300 (1984) (requiring independent fact finding at sentencing phase of a Graves Act case). We do not now pass on that issue.

VIII.
Finally, we address the interesting and troublesome issue stemming from Robinson's claim of entitlement to a new trial because Gorman, whose Fifth Amendment rights made him unavailable to Robinson as a witness at their joint trial, possessed evidence exculpating Robinson. An innocent defendant may be unable to learn the true facts and, in any event, to *360 present a defense through a culpable co-defendant who cannot be compelled to give evidence before or during their joint trial. Robinson asserts that his motion for a new trial on the basis of newly discovered evidence would cure the violation of his right to due process and the deprivation of his right to a fair trial.
The standard for granting a new trial based on newly discovered evidence is clearly set forth in State v. Carter, 85 N.J. 300, 314, 426 A.2d 501 (1981). The new evidence must be
(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.

A.
Gorman testified at the new trial motion that he committed the armed robbery on January 9, 1987 with Denise Bugyi and Andrew Bell. He indicated that he "knew Andrew Bell from doing drugs with him" and knew that Bell "had participated in robberies" when asking him to participate. Gorman met Bugyi, who had been dating his nephew, through his girlfriend at a Christmas party. She and the girlfriend wanted Gorman to "cop cocaine for them" and he made arrangements with Robinson to make a purchase. Robinson thereafter "delivered the package" which "turned out to be baking soda." Bugyi became "[v]ery angry" because she wanted to sell it to pay for her car. She "believed that [Gorman] and Robinson colluded to steal [her] money".
According to Gorman, Bugyi and Rouse returned from a trip to Indiana around Christmas time 1986, and Bugyi was still in need of money. Gorman told her that he would try to "figure out a way to get you the car payment money" and thereafter planned the robbery of Consumer Electronics.
Gorman further testified that the composite sketch drawn by the police was "similar" to Andrew Bell's appearance, that Bugyi and he dropped Bell off at the bank and later picked him up at the pizza parlor. Gorman stated that Robinson "didn't" *361 participate in the robbery and was testifying at the motion because he wanted "to clear my conscience because Jules didn't participate in this". He indicated that he did not "come forward prior to trial" with this information because he was "never offered a reasonable deal to come forward."
Gorman also testified that Bugyi had never seen or met Andrew Bell before the night of the robbery, knew Robinson only by name, and to his "recollection", had never seen him other than on "that one day down when we copped the cocaine". He further testified that he did not see Bell since the night of the crime, but that they spoke on the phone concerning whether the bag was found. Gorman concluded his direct testimony by stating that, "[e]xcept for going to Jules, to look for Jules or picking up Jules", Bugyi's testimony was essentially accurate as to the details of what happened on the evening in question. He suggested that Bugyi had merely implicated Robinson with respect to the role played by Bell.
On cross examination, Gorman admitted that he and Robinson were incarcerated together for about eighteen months and that they talked about the trial. He acknowledged that he had been convicted of "at least 11 armed robberies." He was asked and testified that he declined to take a polygraph about the case and could provide no phone number or address for Bell other than what he told police, that Bell lived "either [in] Vineland or Jersey City." Gorman indicated that he never told authorities that Bell was involved and that Robinson wasn't because he "pleaded the Fifth Amendment through the entire time I was arrested through my trial".
In resisting the motion for a new trial, the prosecutor contended that Robinson did not show "due diligence" because he had not requested either a severance before trial (in order to obtain Gorman's testimony at Robinson's trial) and did not "request that the prosecutor provide use immunity" to Gorman. She contended that "had the defendant merely requested use immunity or had the defendant merely requested a severance, *362 then there would be some evidence of diligence on behalf of the defendant." She also suggested that the new trial motion had to be denied because Gorman's testimony did not "rise to the level of newly discovered evidence because ... there is no indication that the jury's verdict would probably be different," given Gorman's lack of credibility. In essence, she stated "I think that his testimony is unbelievable".
Gorman's trial counsel also testified on the motion for a new trial. He indicated that there was no communication between himself and Robinson's counsel concerning a severance and that he never indicated to Robinson's counsel that Gorman was involved in the robbery. According to Gorman's counsel
... I indicated the opposite ... It was my feeling that Mr. Gorman was innocent of the charges against him. Based on the fact that it was just a co-defendant's statement. There was no other corroboration. It was my opinion that Mr. Gorman was not involved in this robbery.
Denise Bugyi testified for the State at the hearing. She denied ever having any drug transaction with Robinson and denied selling drugs to make any type of car payment or loan payment. She indicated that the first time she met Robinson was "[t]he night of the robbery" and that her trial testimony was truthful. She stated that she had gone to Camden to buy cocaine but that "[t]here was usually lots of people with us" and that the purchase was arranged by Gorman. She could not remember, although it was possible, that she saw Gorman purchase cocaine from Robinson.
The trial judge found that two of the requirements for a motion for a new trial based on newly discovered evidence were met. He found that Gorman's testimony was material, concluding that "[i]f someone believable were to say to the jury that a guy named Bell was there and Jules Robinson was not, that goes to the issue of who was there and who committed a crime." He also concluded that "there is no indication here that Jules Robinson had any information that James Gorman had been involved in the offense as he has now" and that there is no evidence "that Robinson knew that Gorman was in on this *363 crime" before the trial. He further stated that he could not "fault counsel for not asking for a severance because it would not necessarily be a reasonably diligent thing to do under the circumstances," particularly because only the prosecutor could ask for immunity, citing United States v. Rocco, 587 F.2d 144 (3rd Cir.1978). He indicated that even if there was a basis for the grant of immunity there was "nothing on the record to show that Robinson knew that Gorman was in the crime." Hence, the judge concluded that the information was not previously discoverable by reasonable diligence. However, he denied the motion
[b]ecause I have had the opportunity now to see and hear James Gorman. And the fact that part of a story is possibly true does not make the whole story true. His whole story can work even if he had done drug dealings with Jules Robinson down in Camden. Even if he had done drug deals with Andrew Bell. However, this is one of the few opportunities in a jury trial or in any part of a jury proceeding when the court has to make credibility findings.
The judge indicated that Gorman's answers to the questions concerning Robinson's participation
lack[ed] sincerity, they lack credibility, they lack the ring of truth and I don't believe them. And of course, my conclusion as to his credibility is not the ultimate answer in the case, but I need to make a weighing here of whether, if the Robinson case were replayed and if Gorman were to take the stand  he will have been sentenced [by me] at that time  ... [a]nd if he were to tell the same story and his long serious record would come out, whether his saying what he said is likely to change the result in this case, I don't believe that it's been shown that this new evidence would probably produce an acquittal for Robinson. I have no way of absolutely knowing. Because one never knows what a jury is going to do. But I look at these facts as objectively as I can. And as I say that, I realize and I want the record to be clear, that this was not the strongest case in the world against Robinson.
I realize that Middleton was not able to make an in-court identification. That when he picked out Robinson's pictures from an array which had some weaknesses to it, the best he could say is I thought that, with the high probability, that was him. He did not make an in-court identification ... [b]ut we had someone from the pizza shop who was of some help in saying that Robinson looked like the man who came in at that point in time that would have been after the time of the crime that night.
We had the testimony of Bugyi before the jury ... [a]nd the jury knew that she had a record ... The jury knows what kind of a sweet deal she got and how anxious she probably was and is to please the State and help them to make their case.

*364 So they had all of this before them. They had a chance to evaluate her credibility. And even with that and with Denise Bugyi clay feet and all, warts and all, I did not believe that if she were balanced against James Gorman and his story and his record and his credibility, and assuming that he spoke with the same degree of sincerity or lack of it that he did here, I again say I do not believe that this would probably produce an acquittal. And I do not believe that there has been a manifest denial of justice under the law.
I believe that just as a recanting witness, just as with a co-defendant who attempts to exonerate co-defendants after they have been sentenced, I think the court is entitled to view these statements skeptically and critically and not gullibly and wide eyed; I believe that Mr. Gorman's story here today is... a post-conviction fabrication ... [t]he fact that a man's been convicted of some theft crimes and armed robberies does not make everything that he says incredible. It's just that having heard what he said in this case, I don't believe him.

B.
We cannot fault Robinson for not moving to sever, particularly under these circumstances where counsel had no reason to believe that Gorman was involved in the criminal event. He may have concluded at the time that Gorman had no relevant knowledge, and there is no indication that Gorman consented to a pretrial interview by Robinson's counsel. In any event, a severance motion would have undoubtedly failed in light of the general preference to try co-defendants jointly and without indication that Gorman possessed exculpatory evidence.[5]See State v. Brown, 118 N.J. 595, 604-609, 573 A.2d 886 (1990); State v. Morant, 241 N.J. Super. 121, 133, 574 A.2d *365 502 (App.Div. 1990), certif. denied 127 N.J. 323, 604 A.2d 598 (1990). Thus, in the absence of knowledge before trial that a co-defendant possesses evidence exculpatory to the defendant, a severance motion should not generally be a prerequisite for a successful motion for a new trial based on testimony from a co-defendant who agrees to waive his Fifth Amendment rights after verdict or to testify whenever rights are extinguished by final disposition of the case. Accordingly, we agree with the trial judge that the motion for new trial based upon the post-verdict statement of the jointly tried co-defendant could not be rejected because Robinson failed to move for severance.
The traditional criteria for evaluating motions for a new trial based on newly discovered evidence must be examined liberally when new information comes from a co-defendant who is unavailable, as a matter of law, at the time of trial. Under existing New Jersey law a defendant has no right to call a witness before the jury solely to have the witness invoke his privilege against self-incrimination and refuse to testify. Cf. State v. Jamison, 64 N.J. 363, 374-375, 316 A.2d 439 (1974); State v. Crews, 208 N.J. Super. 224, 232, 505 A.2d 198 (App.Div. 1986), aff'd o.b. 105 N.J. 498, 523 A.2d 149 (1987); State v. Cito, 213 N.J. Super. 296, 300-301, 517 A.2d 174 (App.Div. 1986), certif. denied, 107 N.J. 141, 526 A.2d 203 (1987); State v. Nunez, 209 N.J. Super. 127, 132, 506 A.2d 1295 (App.Div. 1986); State v. Karlein, 197 N.J. Super. 451, 456, 484 A.2d 1355 (Law Div. 1984). See also Evid.R. 39. In any event, no one contends that a defendant may call a co-defendant to the stand during a joint trial. It is acknowledged that both the Fifth Amendment and our Rules of Evidence would preclude that.
There may be constitutional issues and questions of fundamental fairness projected by the inability of a defendant in certain circumstances to call a witness for purposes of asserting his Fifth Amendment privilege before the jury and obtaining a beneficial inference. This is particularly true because, at present, only the State, and not the defendant, can *366 immunize a witness. See N.J.S.A. 2A:81-17.3. Robinson never attempted to call Gorman to the stand, and a motion for a new trial based on newly discovered evidence premised on the inability to call a co-defendant to the stand is not the proper vehicle to examine that issue or the question of whether a defendant can ever seek to immunize a witness. Certainly it could never be done with respect to a co-defendant in a joint trial. In any event, the fact remains that because of the current status of New Jersey law and the fact that only the State can request immunity for a witness, we must reject the State's contention that Robinson's failure to seek immunity for Gorman precludes his motion for a new trial due to the absence of "reasonable diligence." See United States v. Rocco, supra, 587 F.2d at 146-148; but see State v. Redford, 248 Kan. 130, 804 P.2d 983 (1991). Hence, Robinson satisfied the "due diligence" requirement.
As the trial judge also noted, information from someone admittedly involved in a criminal transaction must generally be deemed more than "merely cumulative, impeaching or contradictory", although that may depend on the quality and quantity of the proofs at trial. In most instances, a defendant's testimony about the involvement of a co-defendant in a given transaction must be deemed "material to the issue", and the availability of the co-defendant to testify upon waiver of his Fifth Amendment rights following verdict, or upon final disposition of his case (and we do not decide when that occurs for these purposes), see e.g., State v. Craig, 107 N.J. Super. 196, 257 A.2d 737 (App.Div. 1969), certif. denied, 55 N.J. 169, 259 A.2d 919 (1969), must be deemed "newly discovered." Thus, we agree with the trial judge that Gorman's testimony was "material."
But even though credibility determinations are generally for the fact-finder, a mere exculpatory statement of a co-defendant cannot by itself give rise to a new trial if that statement is clearly false or merely designed to give an accomplice *367 a second chance for acquittal. While the motion judge upon receipt of a statement from a co-defendant jointly tried with the moving party should almost always grant an evidentiary hearing and treat the application most seriously, here the trial judge conducted such a hearing at which Gorman testified and was cross examined. At that hearing, the judge also heard from Gorman's counsel and Bugyi, the principal witness at the trial. The judge thereafter concluded that Gorman's story was clearly manufactured and did not have the minimum ring of truth sufficient to have the credibility issue presented to the jury. Given the proofs presented on the motion, the absence of any ability whatsoever to detail any specifics about Andrew Bell, and the trial judge's specific and detailed findings of fact based upon his assessment of credibility, we cannot conclude that the trial judge erred in denying the motion for a new trial. See e.g. Hill v. Lockhart, 927 F.2d 340, 345-46 (8th Cir.1991); United States v. Hendrix, 752 F.2d 1226, 1234 (7th Cir.1985), cert. den. 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314; United States v. Rocco, supra, 587 F.2d at 148; United States v. Castano, 756 F. Supp. 820, 824 (S.D.N.Y. 1991); United States v. Persinger, 587 F. Supp. 899, 902 (W.D.Pa. 1984); State v. Redford, supra, 804 P.2d at 986-987; People v. Houston, 151 Ill.App.3d 102, 104 Ill.Dec. 451, 502 N.E.2d 1111, 1119-1120 (Ill. App. 1 Dist. 1986). See also e.g., State v. Carter, 69 N.J. 420, 426-428, 354 A.2d 627 (1976); State v. Puchalski, 45 N.J. 97, 106-108, 211 A.2d 370 (1965); State v. Sullivan, 43 N.J. 209, 232-33, 203 A.2d 177 (1964) (recantation of trial testimony). "This is especially true since [Gorman] as a sentenced co-defendant, had nothing to lose by exonerating [Robinson] and his testimony is therefore `inherently suspect.'" United States v. Castano, supra, 756 F. Supp. at 824, quoting United States v. LaDuca, 447 F. Supp. 779, 782 (D.N.J. 1978), aff'd. 587 F.2d 144 (3d Cir.1978) cert. den. 440 U.S. 972, 99 S.Ct. 1537, 59 *368 L.Ed.2d 789 (1979).[6]

IX.
The judgments of conviction of both defendants are affirmed except that Gorman shall be awarded "gap time" credits as noted above. The matter is remanded for reconsideration of sentence consistent with this opinion.
NOTES
[1] We have consolidated these appeals for purposes of opinion.
[2] In a pro se supplementary brief Robinson also argues:

POINT I DEFENDANT'S CONSTITUTIONAL RIGHTS, AS PROVIDED IN THE SIXTH AND FOURTEENTH AMENDMENTS, WERE VIOLATED AT TRIAL, RENDERING AN ILLEGAL SENTENCE, AND NOT SUPPORTED BY THE RECORD BELOW.
A. DEFENDANT'S SIXTH AND FOURTEENTH AMENDMENTS RIGHTS WERE VIOLATED WHEN THE OFFICE OF THE PUBLIC DEFENDER FAILED TO PROVIDE DEFENDANT THE EFFECTIVE ASSISTANCE OF COUNSEL.
B. DEFENDANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN DEFENSE COUNSEL FAILED TO RECORD ORAL AND WRITTEN TESTIMONY FROM KEY WITNESS FOR THE DEFENSE BY ALIBI.
C. DEFENDANT'S SIXTH AND FOURTEENTH AMENDMENTS RIGHTS WERE VIOLATED WHEN THE COURT FAILED TO ABIDE BY THE PROVISION OF THE SPEEDY TRIAL ACT.
D. DEFENDANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN AT TRIAL DEFENSE COUNSEL FAILED TO SUBPOENA THE MEDICAL EXPERT WITNESS.
[3] Here the judge carefully instructed the jury on accomplice liability and the required purpose of each individual separately, even though the indictment did not expressly allege it. See State v. Hakim, 205 N.J. Super. 385, 501 A.2d 159 (App.Div. 1985).
[4] Hopefully, since the Graves Act was adopted, judgments of conviction specify on their face if a "Graves Act" violation was involved, particularly with respect to offenses that do not require use or possession of a "firearm."
[5] We recognize that there are cases which hold that testimony of a co-defendant who elected not to testify at a joint trial is generally not "newly discovered" evidence, particularly if defendant did not move to sever or where defendant could not show that the "new" evidence was unknown to him. See e.g., United States v. Diggs, 649 F.2d 731, 740 (9th Cir.1981), cert. den. 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981); United States v. Jacobs, 475 F.2d 270, 286, n. 3 (2d Cir.1973), cert. den. 414 U.S. 821, 94 S.Ct. 116, 131, 38 L.Ed.2d 53 (1973); United States v. Bujese, 371 F.2d 120, 125 (3d Cir.1967); cf. State v. Schultheis, 113 N.J. Super. 11, 18, 272 A.2d 544 (App.Div. 1971) (statement of brother, not co-defendant). See generally, "What Constitutes `Newly Discovered Evidence' Within Meaning of Rule 33 of Federal Rules of Criminal Procedure Relating to Motions for New Trial," 44 A.L.R.Fed. 13, 72-74 (1979) and 15-17 (1991 Supp.).
[6] In United States v. Hendrix, supra, 752 F.2d at 1234 the Seventh Circuit also considered such statements "inherently suspect" and further noted that there was no reason to believe that the declarant "could be induced to repeat his exculpatory statement at a future trial." Compare, State v. Tapia, 113 N.J. Super. 322, 332-33, 273 A.2d 769 (App.Div. 1971). We do not rely on this additional rational as the statement may nevertheless be admitted under Evid.R. 63(10).