# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1137-15T1
               A-1148-15T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

M.C.,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

E.W.,

    Defendant-Appellant.

_____

           Submitted May 7, 2018 — Decided August 3, 2018

           Before Judges Accurso, O'Connor and Vernoia.

           On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 11-08-0888.

           Joseph E. Krakora, Public Defender, attorney for appellant M.C. (Brian P. Keenan, Assistant

Deputy Public Defender, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant E.W. (Richard Sparaco, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sarah E. Elsasser, Deputy Attorney General, of counsel and on the briefs).

PER CURIAM

These back-to-back appeals are consolidated for this opinion. In A-1148-15, defendant E.W. appeals from his convictions and sentence for kidnapping, sexual assault and two counts of aggravated sexual assault. In A-1137-15, defendant M.C. appeals from his convictions for sexual assault and two counts of aggravated sexual assault. Based on our review of the record and defendants' arguments under the applicable legal principles, we affirm their convictions, vacate the sentences on their convictions for first-degree aggravated sexual assault under N.J.S.A. 2C:14-2(a)(7) and remand for resentencing on those charges.

I.

The charges against defendants arose out of an alleged kidnapping and sexual assault of thirty-year-old S.S. on the evening of January 31, 2011, and early morning hours of February 1, 2011. E.W. was charged in an indictment with first-degree

kidnapping, N.J.S.A. 2C:13-1(b)(1), first-degree aggravated sexual assault while aided or abetted by another and by using physical force or coercion, N.J.S.A. 2C:14-2(a)(5), first-degree sexual assault upon a victim E.W. knew, or should have known, was mentally defective, N.J.S.A. 2C:14-2(a)(7), second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and third-degree witness tampering, N.J.S.A. 2C:28-5(a). The court dismissed the witness tampering charge prior to trial.

M.C. was charged in the indictment with first-degree aggravated sexual assault while aided or abetted by another and by using physical force or coercion, N.J.S.A. 2C:14-2(a)(5), first-degree sexual assault upon a victim M.C. knew, or should have known, was mentally defective, N.J.S.A. 2C:14-2(a)(7), and second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1).

At defendants' joint trial, the evidence showed that in January 2011, S.S., who is in the moderate to severe range of "mental retardation,"[1] resided with her adoptive mother, B.S., and

---

[1] We recognize the term "mental retardation" is disfavored, and the term "intellectual disability" is currently accepted in the medical community "to describe the identical phenomenon." Hall v. Florida, 582 U.S. ___, ___, 134 S. Ct. 1986, 1990 (2014); see also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2014) (explaining "intellectual disability is the term in common use by medical, educational, and other professions and by the lay public and advocacy groups" to refer to the disability previously denominated

another female family member, L.L.  B.S. adopted S.S. when S.S. was seven months old and, at age five, S.S. was diagnosed as severely handicapped.  S.S. attended a school for special needs children until she was twenty-one.

S.S. cannot read, write, cook or use public transportation on her own, and is not capable of holding a job, does not understand the value of money, and cannot function independently.  As a result of her handicap, S.S. considered anyone who was nice to her to be her friend, and believed anything that was told to her.  S.S. gave birth to children in 2009 and 2010, both of whom were removed from her care.  Prior to January 31, 2011, L.L. assisted S.S. with daily hygiene, bathing, and looked after her while B.S. was at work.  After the incident alleged in the indictment, S.S. moved to a group home because she is unable to care for herself.

Shortly before January 31, 2011, S.S. joined a church where she met E.W., who was also a member.  B.S. and L.L. did not join or attend this church with her.  On January 31, 2011, L.L. overheard telephone calls between S.S. and a man who was identified as E.W.  According to L.L., E.W. pressured S.S. to attend Bible

---

as "mental retardation").  We use the term "mental retardation" and others, such as mental disability and mental defect, because they are the terms employed by the court, counsel and witnesses during trial.

study at the church during the phone calls.  S.S. agreed to go to the Bible study, and provided E.W. with her address.

At approximately 10:00 p.m., E.W. arrived at S.S.'s home in a van driven by another person, and introduced himself to L.L. and B.S.  L.L. testified that E.W. looked like he had had "one or two drinks," but did not have difficulty responding to her or B.S.'s questions.  E.W. said he was taking S.S. to Bible study classes, and promised to bring her home afterward.  B.S. and L.L. acquiesced because church members often transported S.S. to services and classes, and they expected S.S. to return that night.  In his statement to police, E.W. acknowledged drinking that day, and picking up S.S. at her home, but claimed he and S.S. planned only to "hang out."

Although there was conflicting evidence concerning the timing and sequence of the events immediately following E.W. and S.S.'s departure from her home, it is undisputed E.W. and S.S. got into a van that had two other men in it.  Approximately two hours after the van departed from S.S.'s home, the driver of the van dropped off E.W. and S.S. at E.W.'s home, and left with the other passenger.

When E.W. and S.S. arrived at the home, they were met by M.C., E.W.'s brother and an individual identified as V.B.  The five individuals spent time on the porch drinking and then went

A-1137-15T1

inside. At approximately 2:30 a.m., E.W., M.C. and V.B. went into the basement with S.S.

S.S. testified that, once in the basement, E.W. took her clothes off, "made [her] go down on him," "stuck his thing in [her]," and "hit [her] from [her] back," meaning E.W. made her perform oral sex on him, and vaginally and anally penetrated her with his penis. She also testified that an individual later identified as M.C. did the same thing to her. S.S. testified she told the men to stop, but they did not.[2] S.S. explained that when the assaults ended, she slept on a chair in E.W.'s room and, when she awoke the next morning, E.W.'s sister arranged for a cab to take S.S. home.

When S.S. arrived home, L.L. thought S.S. seemed unusually quiet, was very dirty and smelled badly. S.S. initially refused to answer L.L.'s questions, but then told L.L. that E.W. put his penis in her mouth, another man put his penis in her anus and her anus was very sore. S.S. told L.L. that she told the men "no," but they forced her to engage in the sexual activity.

---

[2] S.S. also testified she provided a statement to the police stating that she went "down on" E.W. while his friend penetrated her anally from behind, and that E.W. and his friend switched places and the same things occurred.

L.L. called E.W., who acknowledged putting his penis in S.S.'s mouth, denied having sexual intercourse with S.S. and asked L.L. not to call the police. L.L., however, then notified the police.

S.S. subsequently took the police to E.W.'s house and provided a description of E.W., but was unable to identify M.C. Pursuant to police instructions, L.L. brought S.S. to Muhlenberg Hospital for an evaluation. Thelma Kaiser, a trained Sexual Assault Nurse Examiner (SANE), conducted an examination and evaluation in the emergency room on February 1, 2011. She took S.S.'s medical history, observed S.S. to be "very sleepy," and asked S.S. about the incident.

Kaiser examined S.S. and observed injuries to her vaginal and anal areas, including a one-quarter inch anal tear. Kaiser found no other visible injuries such as bites or burns. Kaiser offered S.S. antibiotics and emergency contraceptive medication.

S.S., B.S., and L.L. each gave formal statements to police, but they were not introduced in evidence at trial. As a result of her mental disability, S.S.'s statement was taken at the Child Advocacy Center.

Union County Prosecutor's Office detective Edward Rivera interviewed E.W. on February 3, 2011. The video recording of E.W.'s voluntary statement was admitted in evidence and played for the jury. E.W. said he knew S.S. from church, and she had a crush

on him and asked to perform oral sex on him and have sexual intercourse with him. He admitted picking up S.S. at her home, and taking her to his family's home to "hang out." E.W. explained that S.S. wanted to kiss him, hug him and "love" him, but he was not attracted to her.

E.W. said S.S. voluntarily performed oral sex on him, but he denied engaging in sexual intercourse with or forcing her to do anything. He also said he "didn't notice she had anything wrong mentally" and claimed he just wanted to "be her friend."

On February 8, 2011, Rivera and Union County Prosecutor's Office detective Brian O'Malley interviewed M.C. A transcript of the interview was read to the jury at trial. M.C. admitted being on the porch of E.W.'s family's home with V.B. and E.W.'s brother late in the evening on January 31, 2011, when E.W. arrived with a woman. He denied entering the house that evening and engaging in any sexual activity with S.S., stating:

> Nah. I didn't mess with her. Nothing. I didn't even do nothing with that girl or nothing. You know what I'm saying? That's crazy though they would put my name in it, you know what I'm saying, and say I had something to do with it. I ain't had nothing to do with that chick. If I did have something to do with it, I would say I did though, but I didn't though. You know what I'm saying?

Monica Ghannam, a forensic scientist employed in the Union County Prosecutor's Office's forensic laboratory, analyzed

vaginal, cervical, and anal swabs taken from S.S. and her underwear during Kaiser's examination, and DNA samples from S.S., E.W., M.C. and V.B.  Ghannam testified S.S.'s cervical specimens tested negative for acid phosphatase and sperm, but the anal swab tested positive for acid phosphatase and sperm. Samples taken from the back panel and interior crotch area of S.S.'s underwear, also tested positive for acid phosphatase and sperm.

Ghannam, who was qualified as an expert witness in the field of serology and DNA analysis, opined that "the mixture of those two individuals [E.W. and M.C.] accounts for all the DNA types that are in the sperm fraction from the anal swabs."  She further testified the semen collected from the anal specimen matched both E.W. and M.C., and the semen from S.S.'s underwear matched M.C. Ghannam testified V.B.'s DNA was not found at a detectable level on any of the samples taken from S.S.

Dr. Louis Schlesinger was qualified as an expert in forensic psychology.  He evaluated S.S. and testified she "can do basic, minimal things" and was "very pleasant and very friendly" but had "very significant brain damage."  Schlesinger explained that S.S. had "no functional academic skills," could not drive, read, or write and did not have a bank account, but could operate a cell phone.

Schlesinger conducted a number of psychological tests on S.S. that revealed she is "very, very childlike and regressive," and typical of someone who is "mentally retarded." Schlesinger determined S.S. had "very, very low" cognitive functioning and an I.Q. of approximately forty-five, placing her in the moderate to severe range of mental retardation. He found S.S. had "impairment in almost all areas of adaptive functioning."

During the evaluation, S.S. told Schlesinger that

> [o]ne of the boys made me go down on him and the other made me suck him off. One put it in my butt and I still got the bruise on the back of my butt. I told him I wanted to go home but he wouldn't let me go home. I kept telling him no. I didn't want to do it. He kept forcing me. I kept saying no. Then I went home after that.

Schlesinger noted a number of inconsistencies in S.S.'s version of the incident, but nonetheless found her to be "very credible" and suggested that inconsistencies were not surprising given her low intelligence. He opined that S.S. understands the basic mechanics of sex and "knows people don't have the right to force her to have sex" but concluded she had only a minimal ability to resist engaging in sex and was incapable of exercising her right to refuse to engage in sexual activity on the night of the incident. He testified that she "cannot fend off anything" and was "unable to exercise any of her rights not to consent."

A-1137-15T1

E.W. called one witness, V.B. V.B. testified he was at his home with M.C., E.W.'s brother and E.W.'s brother's friend at 9:00 or 10:00 p.m. on January 31, 2011. They left his home, walked to a local bank and, as they returned, he saw E.W. in a parked van receiving oral sex from a woman. He testified the woman appeared willing, and there was no evidence of force.

Later, he was across the street from E.W.'s house and saw the van drop off E.W. and S.S. V.B. testified that he, M.C. and E.W.'s brother walked across the street and joined E.W. and S.S. on the porch of E.W.'s house. The group walked into the hallway of the home, and he, E.W., M.C. and S.S. decided to go into the basement to get warm. V.B. testified S.S. was not reluctant to enter the basement and "wanted to be there."

According to V.B., once in the basement, E.W. and M.C. simultaneously engaged in unprotected sexual activity with S.S., who did not cry, scream, or request that they stop. V.B. testified S.S. said "I like that Daddy. It's good. Keep it going." V.B. explained that during the approximately one hour and fifteen minutes they were in the basement, E.W. and M.C.'s sexual activity with S.S. continued, and she did not complain. V.B. denied engaging in sexual activity with S.S., and explained that E.W. invited S.S. upstairs to go to bed, and he and M.C. left E.W.'s home.

The jury convicted E.W. and M.C. on each of the charges against them. E.W. made a motion for acquittal or, in the alternative, for a new trial, which the court denied.

The court merged E.W.'s conviction for second-degree sexual assault with his conviction for first-degree kidnapping and sentenced defendant to twenty years subject to the requirements of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court imposed concurrent eighteen-year terms, subject to NERA's requirements, on E.W.'s two first-degree aggravated sexual assault convictions. E.W. appealed.

The court merged M.C.'s conviction for second-degree sexual assault with his conviction for first-degree aggravated sexual assault under N.J.S.A. 2C:14-2(a)(5), and imposed an eighteen-year custodial term subject to NERA. The court imposed a concurrent eighteen-year term subject to NERA on M.C.'s conviction for first-degree aggravated sexual assault under N.J.S.A. 2C:14-2(a)(7). M.C. appealed.

On appeal, E.W. presents the following arguments for our consideration.

POINT I

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO MULTIPLE HEARSAY STATEMENTS BY THE SANE NURSE REGARDING WHAT THE ALLEGED VICTIM TOLD HER DURING HER EVALUATION.

12

POINT II

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL
DUE TO [THE] COURT'S DENIAL OF HIS MOTION FOR
SEVERANCE.

POINT III

THE COURT'S SENTENCE OF THE TWENTY YEARS WAS
EXCESSIVE.

POINT IV

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S
MOTIONS FOR JUDGMENTS OF ACQUITTAL N.O.V. OR
NEW TRIAL[.]

M.C. separately offers the following arguments in support of

his appeal:

POINT I

[M.C.] WAS GRAVELY PREJUDICED BY THE TRIAL
JUDGE'S ERROR IN DENYING HIS MOTION TO SEVER
CODEFENDANT [E.W.]'S KIDNAPPING CHARGE.

POINT II

THE TRIAL JUDGE ERRED IN DENYING [M.C.]'S
MOTION FOR A JUDGEMENT [SIC] OF ACQUITTAL ON
THE SEXUAL ASSAULT — MENTAL DEFECT CHARGE, AND
INSTEAD PROVIDED AN INSTRUCTION THAT LOWERED
THE STATE'S BURDEN BY DIRECTING THE JURY TO
CONSIDER THE FACTS SURROUNDING THE INCIDENT
IN DETERMINING WHETHER [S.S.] HAD THE
REQUISITE MENTAL DEFECT.

POINT III

THE TRIAL JUDGE ERRED IN ALLOWING THE
PROSECUTOR TO ARGUE IN SUMMATION, WITHOUT THE
SUPPORT OF EXPERT-OPINION TESTIMONY, THAT THE
COMPLAIN[]ANT'S QUARTER-INCH ANAL TEAR WAS

EVIDENCE INDICATING THAT THE INTERCOURSE WAS
NONCONSENSUAL.

POINT IV

THE STATE EXPERT'S TESTIMONY INVADED THE
DOMAIN OF THE JURY BY IMPROPERLY OPINING ON
THE ULTIMATE ISSUE AND THE CREDIBILITY OF
OTHER WITNESSES.

POINT V

THE TRIAL JUDGE ERRED IN APPARENTLY USING AN
ELEMENT OF ONE OF THE OFFENSES TO FIND TWO
AGGRAVATING FACTORS, AND IN FAILING TO EXPLAIN
THE APPLICATION OF AGGRAVATING FACTORS AND
REJECTION OF MITIGATING FACTORS, RESULTING IN
A MANIFESTLY EXCESSIVE SENTENCE.

II.

We first address E.W.'s arguments in A-1148-15 concerning alleged trial errors. He contends the court erred by allowing Kaiser to testify concerning statements made by S.S. during her examination at the hospital. He also contends the court erred by denying his motions for severance and a new trial. For the following reasons, we find no merit to E.W.'s arguments.

A.

Kaiser testified about statements S.S. made during her February 1, 2011 examination at the hospital. Kaiser detailed what was reflected in her report during the following exchange:

Q. And in his case did [S.S.] give you a description of the incident?

A. Yes.

Q:   And can you tell us what she said?

A:   It's in quotes.  He brought me to his house.  Right away I went down on him and he stuck his thing in my butt and also vagina.  I was screaming and the upstairs neighbor came down and gave me cab money to go home.  My sister called police.  She went down on — she went down and E and second guy his butt and vaginal and kept saying — I kept saying no, stop, but he didn't.

Q. Does that say[,] "put in her butt," I think the third or fourth line from the bottom?

A. Yeah, put in her butt.

E.W. did not object to the testimony, and argues for the first time on appeal the court committed plain error by permitting the State to elicit inadmissible hearsay testimony.  He contends Kaiser's testimony was not admissible as fresh-complaint evidence, see State v. R.K., 220 N.J. 444, 455 (2015) (explaining the fresh-complaint doctrine), or under N.J.R.E. 803(c)(4), which allows admission of statements made in good faith for purposes of medical diagnosis or treatment, because Kaiser's examination was conducted for "evidence-gathering purposes."

It is unnecessary to consider whether S.S.'s statements to Kaiser were admissible as fresh-complaint evidence because the State does not contend they were.  The State argues Kaiser's testimony concerning S.S.'s statements was admissible under N.J.R.E. 803(c)(4), which provides:

15

> Statements made in good faith for purposes of medical diagnosis or treatment which describe medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof to the extent that the statements are reasonably pertinent to diagnosis or treatment.

"It has long been the rule in New Jersey that the declarations of a patient as to his [or her] condition, symptoms and feelings made to his [or her] physician for the purpose of diagnosis and treatment are admissible in evidence as an exception to the hearsay rule." Cestero v. Ferrara, 57 N.J. 497, 501 (1971). The "rationale" for the rule "is that such statements possess inherent reliability because 'the patient believes that the effectiveness of the treatment [she] receives may depend largely upon the accuracy of the information [she] provides the'" medical care provider. R.S. v. Knighton, 125 N.J. 79, 87 (1991) (citation omitted).

To be admissible under N.J.R.E. 803(c)(4), a patient's statements must be "made in good faith for purposes of medical diagnosis or treatment." State v. Pillar, 359 N.J. Super. 249, 289 (App. Div. 2003) (quoting N.J.R.E. 803(c)(4)). The rule is based upon a presumed "treatment motive," and thus a statement by a declarant who "is unaware that his or her statements will enable a physician to make a diagnosis and administer treatment" lacks

the requisite degree of trustworthiness to qualify under this exception. R.S., 125 N.J. at 87-88. For that reason, hearsay obtained during evidence gathering and medical consultations conducted purely in preparation for litigation remains inadmissible. State in the Interest of C.A., 201 N.J. Super. 28, 33 (App. Div. 1985); see also Pillar, 359 N.J. Super. at 289 (noting "[t]here is no doubt that if the examination . . . was conducted for evidence gathering purposes, the hearsay statements contained in the medical history would be inadmissible as not falling within" N.J.R.E. 803(c)(4)).

To be admissible, the statements must "describe medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof to the extent that the statements are reasonably pertinent to diagnosis or treatment." Pillar, 359 N.J. Super. at 289 (quoting N.J.R.E. 803(c)(4)). Thus, "ordinarily statements made as to the cause of the symptoms or conditions" are not admissible, Cestero, 57 N.J. at 501, because they are not relevant to the patient's treatment, State v. McBride, 213 N.J. Super. 255, 273 (App. Div. 1986).

Kaiser testified the purpose of her examination was twofold: to take care of S.S. "mentally [and] physically," and to collect evidence. Kaiser asked S.S. to describe what occurred in order

to determine where to look for injuries, and then conducted a physical examination during which she assessed S.S.'s injuries, but also gathered evidence for law enforcement. She also provided S.S. with care following the examination, offering S.S. medication for any sexually transmitted diseases and a pill to prevent pregnancy. The evidence also showed S.S. went to the hospital solely because the police instructed her to do so.

It is unclear from the record whether S.S. made the statements to obtain medical treatment, provide evidence or both. It is therefore not possible to determine whether her statements were made with a "treatment motive" and had the requisite trustworthiness to allow their admission under N.J.R.E. 803(c)(4). R.S., 125 N.J. at 87. In any event, her statements she was brought to "his house," was "screaming and the upstairs neighbor came down and gave [her] cab money to go home," her "sister called the police," and she "kept saying no, stop, but he didn't" are unrelated to her medical history, her injuries and the need for treatment, and are inadmissible under N.J.R.E. 803(c)(4). See Cestero, 57 N.J. at 501; Pillar, 359 N.J. Super. at 289.

Because there was no objection to Kaiser's testimony about S.S. statements at trial, we consider its admission under the plain error standard. R. 2:10-2. We will disregard the error unless it is "clearly capable of producing an unjust result."

18                                                                      A-1137-15T1

State v. Daniels, 182 N.J. 80, 95 (2004) (quoting R. 2:10-2); State v. Bakka, 176 N.J. 533, 547-48 (2003). The error must be "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971). Based on that standard, we find no plain error in the admission of Kaiser's testimony.

The testimony added little and did not prejudice E.W. S.S. testified at trial, provided the same version of the events she relayed to Kaiser and was subject to cross-examination. Moreover, in E.W.'s statement to the police, he corroborated that he was with S.S. and took her to his home and into the basement. The evidence established E.W.'s DNA was found in S.S.'s anus. Indeed, E.W.'s counsel's decision to allow the testimony without objection "weigh[s] heavily" against a finding of prejudice establishing plain error. State v. Cain, 224 N.J. 410, 432 (2016). "[A]ny finding of plain error depends on an evaluation of the overall strength of the State's case." State v. Nero, 195 N.J. 397, 407 (2008) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)); see also State v. Sowell, 213 N.J. 89, 107-08 (2013) (affirming conviction given the strength of evidence against the defendant despite the admission of improper expert testimony); State v. Soto, 340 N.J. Super. 47, 65 (App. Div. 2001) (holding that erroneous admission of hearsay testimony that the defendant was

19

involved in a robbery was harmless error in view of the other proofs establishing guilt). We have considered the trial record, the weight of the evidence against E.W., and the insignificance of Kaiser's testimony concerning S.S.'s statements, and are satisfied the testimony was not clearly capable of producing a result the jury would not have otherwise reached.

### B.

E.W. next claims the court erred by denying his motion to sever his trial from M.C.'s. In M.C.'s statement to the police, he explained that when he saw S.S. on January 31, 2011, he observed that "something is wrong with her" and "she [is] not too — up here[,] she [is] not wrapped too tight." After the court determined those statements were admissible in E.W. and M.C.'s joint trial, E.W. made a severance motion claiming admission of the statements violated his Sixth Amendment right to confront the witnesses against him. See Bruton v. United States, 391 U.S. 123, 136 (1968); State v. Weaver, 219 N.J. 131, 153 (2014). The court denied the motion, finding severance was unnecessary because the statements did not infringe on E.W.'s confrontation rights under Bruton.

There is a high risk of prejudice to a defendant "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant,

are deliberately spread before the jury in a joint trial." Bruton, 391 U.S. at 135-36. Thus, where a co-defendant does not testify at trial, those portions of the co-defendant's statements that directly implicate a defendant are not admissible. Id. at 132; Weaver, 219 N.J. at 153.

As our Supreme Court recognized in Weaver, "Bruton's application is limited" and "does not apply to a statement that is linked to the defendant only through other evidence and 'is not incriminating on its face.'" 219 N.J. at 153 (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987)); see also Gray v. Maryland, 523 U.S. 185, 195-96 (1998); Richardson, 481 U.S. at 208. "If the co-defendant's incriminatory statement requires the jury to make an inferential step to link the statement to the defendant, the statement is admissible." Weaver, 219 N.J. at 159.

Here, M.C.'s statements concerning his observations of S.S. do not, on their face, directly implicate E.W. in the commission of any crime. To the contrary, they pertain solely to M.C.'s perceptions, and do not provide any information about E.W. or his observations of S.S. E.W. argues the jury may have relied on M.C.'s statements to conclude that he also perceived S.S. as having a mental disability or defect, but the jury's potential use of the statements to make such an inferential link did not violate E.W.'s confrontation rights under Bruton. Id. at 153, 159. Thus, the

21

court correctly denied E.W.'s severance motion because M.C.'s statements were admissible at their joint trial.

We also reject E.W.'s contention, made for the first time on appeal, that M.C.'s statements should have been excluded under N.J.R.E. 403 because they were unduly prejudicial and of no probative value. Where a party objects to the admission of evidence under N.J.R.E. 403 as unduly prejudicial, "the inquiry . . . is whether the probative value of the evidence 'is so significantly outweighed by [its] [prejudicial] inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues." State v. Cole, 229 N.J. 430, 448 (2017) (first alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). The party challenging the admission of evidence under N.J.R.E. 403 has the burden of showing the evidence should be excluded. Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001).

M.C.'s knowledge of S.S.'s mental disability was an element of one of the offenses with which he was charged. He and E.W. were each charged with violating N.J.S.A. 2C:14-2(a)(7), which at the time of the January 31, 2011 incident, provided that:

> An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:

22

. . . .

> (7) The victim is one whom the actor knew or should have known was physically helpless, mentally defective or mentally incapacitated.[3]

Thus, M.C.'s statements were highly probative because they established he was with S.S. on January 31, 2011, and knew S.S. suffered from a mental disability.

E.W. makes no showing the statements had any prejudicial "inflammatory potential." See Cole, 229 N.J. at 448. In a hearing prior to the admission of M.C.'s statements, the court ordered the redaction of any references to E.W., and, as noted, admission of the statements did not violate E.W.'s confrontation rights. Moreover, there were multiple other witnesses who attested to S.S.'s mental disability, and the court instructed the jury that it was to separately consider the charges against E.W. and M.C.

---

[3] One year after the January 31, 2011 incident, N.J.S.A. 2C:14-2(a)(7) was amended. See L. 2011, c. 232. In the amendment, which became effective on March 17, 2012, the terms "mentally defective" and "mentally incapable" were deleted from the definitions applicable to Chapter 14 of the Criminal Code, N.J.S.A. 2C:14-1 to -12, see L. 2011, c. 232, and N.J.S.A. 2C:14-2(a)(7) was modified to prohibit an act of sexual penetration with another person where "[t]he victim is one whom the actor knew or should have known was physically helpless or incapacitated, intellectually or mentally incapacitated, or had a mental disease or defect which rendered the victim temporarily or permanently incapable of understanding the nature of his conduct, including, but not limited to, being incapable of providing consent," see ibid.; compare N.J.S.A. 2C:14-2(a)(7) (2011), with N.J.S.A. 2C:14-2(a)(7) (2012).

based only on the evidence relevant and material to the separate charges. In sum, there is no basis to conclude admission of the statements violated N.J.R.E. 403, and E.W. otherwise makes no showing that even if it did, the admission constitutes plain error. See R. 2:10-2.

C.

We next consider E.W.'s argument that the court erred by denying his motion for acquittal notwithstanding the verdict or, in the alternative, a new trial. E.W. offers little in support of the contention, other than conclusory assertions that his convictions are not supported by sufficient evidence, and affirmance of his convictions would constitute a manifest miscarriage of justice.

Rule 3:18-1 provides that a court "shall . . . order . . . a judgment of acquittal . . . if the evidence is insufficient to warrant a conviction . . . ." The court must determine if

> the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. D.A., 191 N.J. 158, 163 (2007); accord State v. Reyes, 50 N.J. 454, 458-59 (1967).]

We review a trial court's denial of a motion for acquittal de novo. State v. Williams, 218 N.J. 576, 593-94 (2014).

Rule 3:20-1 allows a trial court to grant a defendant's new trial motion "if required in the interest of justice." A trial court's ruling on a new trial motion "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1; accord State v. Perez, 177 N.J. 540, 555 (2003). Further, a "motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div.) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)), certif. denied, 228 N.J. 156 (2016).

Measured against these standards, we affirm the court's denial of E.W.'s motion for acquittal or a new trial. Our review of the record reveals ample evidence supporting defendant's convictions. His arguments to the contrary are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

### III.

We next address M.C.'s arguments in A-1137-15 that the court erred by: denying his severance motion because he was prejudiced by being tried with E.W., who was charged with first-degree

25

kidnapping; denying his motion for acquittal on the first-degree aggravated sexual assault charged under N.J.S.A. 2C:14-2(a)(7) and incorrectly charging the jury concerning the elements of the offense; allowing the prosecutor to argue in summation that S.S.'s anal tear constituted evidence the intercourse was forced; and permitting Schlesinger to testify about the credibility of other witnesses.  We are not persuaded and affirm M.C.'s convictions.

A.

Defendant first argues the court erred by denying his motion to sever his trial from E.W.'s trial.  He contends he was unduly prejudiced by the joinder because E.W. was charged and tried for first-degree kidnapping, and there was no allegation he had any knowledge about the alleged kidnapping or participated in its commission.  M.C. asserts the jury's determination S.S. was a kidnapping victim lowered the bar for the State's proofs he committed the charged sexual assaults, and evidence concerning the kidnapping affected the jury's perception of his interactions with S.S.

Rule 3:7-7 permits joinder of two or more defendants who "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."  State v. Brown, 170 N.J. 138, 159-60 (2001). "[W]hen 'much of the same evidence is needed to prosecute each

26

defendant,'" there is a "general preference to try codefendants jointly." Id. at 160 (first quoting State v. Brown, 118 N.J. 595, 605 (1990); and then quoting State v. Robinson, 253 N.J. Super. 346, 364 (App. Div. 1992)). Although the "preference is guided by a need for judicial efficiency, to accommodate witnesses and victims, to avoid inconsistent verdicts, and to facilitate a more accurate assessment of relative culpability," ibid., the "interest in judicial economy cannot override a defendant's right to a fair trial," ibid. (quoting State v. Sanchez, 143 N.J. 273, 282 (1996)); see also Weaver, 219 N.J. at 148 (finding a joint trial of co-defendants is "preferable" where they "are alleged to have participated in the same act or transaction").

Where "it appears that a defendant or the State is prejudiced by" joinder of defendants, a court "may order . . . separate trials of counts, grant a severance of defendants, or direct other appropriate relief." R. 3:15-2(b). In determining a severance motion under Rule 3:15-2(b), "a court must balance the potential prejudice to a defendant against the interest in judicial economy." Brown, 170 N.J. at 160. For example, "a defendant is prejudiced by a joint trial . . . when [the] defendant's and a co-defendant's defenses are not simply at odds, but are 'antagonistic at their core,' meaning that they are mutually exclusive and the jury could

27

believe only one of them." Weaver, 219 N.J. at 149 (quoting Brown, 118 N.J. at 605-07).

Disposition of a motion to sever is left to "the sound discretion of the trial court," Brown, 170 N.J. at 160 (quoting State v. Scioscia, 200 N.J. Super. 28, 42 (App. Div. 1985)). We will reverse a denial of a severance motion "only if it constitutes an abuse of discretion." Weaver, 219 N.J. at 149.

Here, we are not persuaded the court abused its discretion by denying M.C.'s severance motion. In the first instance, M.C. and E.W.'s defenses at trial were not antagonistic, mutually exclusive or irreconcilable, "meaning . . . the jury could believe only one of them." Ibid. Through their counsel, they argued in a consistent manner their sexual activity with S.S. was consensual and S.S. was not a credible witness. Thus, the jury could "return a verdict against one or both defendants by believing neither, or believing portions of both, or, indeed, believing both completely[.]" Brown, 170 N.J. at 160 (quoting Brown, 118 N.J. at 606).

In addition, although E.W. was charged with kidnapping and M.C. was not, the evidence about the kidnapping was limited, pertained solely to E.W. and was wholly unrelated to M.C. See State v. Manney, 26 N.J. 362, 369 (1958) (finding prejudice from joinder of defendants "cannot be grounded merely upon that

eventuality" that there will be "some evidence . . . admissible only as to one defendant"); accord State v. Mayberry, 52 N.J. 413, 421 (1968); State v. Chaney, 160 N.J. Super. 49, 66 (App. Div. 1978). Nor was there any allegation, showing or argument that E.W.'s kidnapping of S.S. was made known to M.C. To the contrary, as M.C. acknowledges and argues, the kidnapping took place when E.W. made false statements to B.S. and L.L. to remove S.S. from her home, and there was no evidence M.C. was involved in S.S.'s removal or was present in the vehicle that transported from her home. The evidence concerning the kidnapping did not prejudice M.C. because none of it pertained to him.

The court also ameliorated any potential prejudice by instructing the jury E.W. "is charged with the crime of kidnapping," the "charge only pertains to" E.W., and M.C. "is not charged with kidnapping." The court further instructed the jurors they were required to consider E.W. and M.C.'s "guilt or innocence separately . . . on each count by the evidence that is relevant and material to the particular charge," and "decide each case individually," and we presume the jury followed the court's instructions. State v. Martini, 187 N.J. 469, 477 (2006); see also State v. Yormark, 117 N.J. Super. 315, 331-32 (App. Div. 1971) (finding the trial court did not err by denying the severance motion where the court instructed the jury to separately consider

29

the crimes charged against each defendant and to consider only the evidence pertinent to each charge).

"While any joinder of offenses or defendants has some potential for harm," Chaney, 160 N.J. Super. at 66, a mere claim or possibility of prejudice is insufficient to require severance, State v. Moore, 113 N.J. 239, 274 (1988). Here, M.C. fails to demonstrate any prejudice from the joinder of the charges against E.W. in his trial, and the court's jury instructions dissipated any possibility of prejudice. The court did not abuse its discretion by denying M.C.'s severance motion.

### B.

M.C. next argues the court erred by denying his motion for a judgment of acquittal at the conclusion of the State's case on count five, which charged first-degree sexual assault in violation of N.J.S.A. 2C:14-2(a)(7). More particularly, he claimed the State failed to present sufficient evidence establishing S.S. was "mentally defective" within the meaning of N.J.S.A. 2C:14-1(h) and, as a result, the State did not prove one of the elements of aggravated sexual assault under N.J.S.A. 2C:14-2(a)(7). M.C. further argues the court's charge concerning N.J.S.A. 2C:14-2(a)(7) erroneously instructed the jury to consider the facts surrounding the incident.

On January 31, 2011, N.J.S.A. 2C:14-2(a)(7) provided that "[a]n actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person" where "[t]he victim is one whom the actor knew or should have known was physically helpless, mentally defective or mentally incapacitated." In count five, M.C. was charged with committing the offense because S.S. was "mentally defective." N.J.S.A. 2C:14-1(h)[4] defined "mentally defective" as a "condition in which a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of understanding the nature of his conduct, including, but not limited to, being incapable of providing consent[.]" N.J.S.A. 2C:14-1(h) (2011).

In State v. Olivio, 123 N.J. 550, 564 (1991), the Court explained there were "significant policy considerations commend[ing] a narrow interpretation of the concept of mentally defective under N.J.S.A. 2C:14-1(h)," and formulated a "standard defining 'mentally defective' for purposes of explaining and applying N.J.S.A. [2C:14-2(a)(7)]."[5] The court held that "a person

[4] As noted in footnote 4, supra, N.J.S.A. 2C:14-1(h) was subsequently deleted and N.J.S.A. 2C:14-2(a)(7) was amended. L. 2011, c. 232. We address only the statutory provisions extant at the time of the January 31, 2011 incident.

[5] In 1985, when the offense charged in Olivio was allegedly committed, sexual penetration of a "mentally defective" victim

is mentally defective under N.J.S.A. [2C:14-2(a)(7)] if, <u>at the time of the sexual activity</u>, the mental defect rendered him or her unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another." <u>Ibid.</u> (emphasis added). "[I]n evaluating the evidence of [the victim's] mental condition," the "test of 'mentally defective'" has three components: "knowledge that conduct is sexual, an understanding that one has the right to refuse to engage in sex, and the ability to assert that right." <u>Id.</u> at 566-67.

M.C. argues he was entitled to dismissal of the N.J.S.A. 2C:14-2(a)(7) (2011) aggravated sexual assault charge because the prosecutor stated during a pretrial proceeding that S.S. consensually engaged in sexual relations on occasions prior to the January 31, 2011 incident, and S.S. testified at trial she said "no" during the alleged assaults. M.C. also relies on Schlesinger's testimony S.S. understood the basic mechanics of

---

constituted a sexual assault under N.J.S.A. 2C:14-2(c)(2). <u>Olivio</u>, 123 N.J. at 555-56; <u>L.</u> 1983, <u>c.</u> 249. In 1997, the "offense was upgraded from sexual assault where it had been denominated as [N.J.S.A.] 2C:14-2(c)(2) to an aggravated sexual assault[,] [N.J.S.A.] 2C:14-2(a)(7)[,] by <u>L.</u> 1997, <u>c.</u> 194." Cannel, <u>New Jersey Criminal Code Annotated</u>, cmt. 2 on N.J.S.A. 2C:14-2 (2018). The "mentally defective" element of the offense, however, remained the same. <u>Compare</u> N.J.S.A. 2C:14-2(c)(2) (1985), <u>with</u> N.J.S.A. 2C:14-2(a)(7) (2011).

sex, people could not force her to have sex, and there are circumstances under which she could have consensual sex.

M.C. contends the evidence showed S.S. was not "mentally defective" under N.J.S.A. 2C:14-2(a)(7) (2011), as that term was interpreted by the Court in Olivio, because S.S. was aware of the sexual nature of the conduct, understood her right to refuse consent and asserted that right, and previously consented to sexual intercourse. He argues the court erred by rejecting his contention and interpreting N.J.S.A. 2C:14-2(a)(7) (2011) to permit consideration of the circumstances of the offense in the determination of whether S.S. was mentally defective under the statute. We disagree.

When viewed in its entirety, and giving the State the benefit of all reasonable inferences, there was sufficient evidence permitting a jury to properly find defendant guilty of aggravated sexual assault under N.J.S.A. 2C:14-2(a)(7) (2011). See State v. D.A., 191 N.J. 158, 163 (2007) (defining the standard for motions for judgment of acquittal). Contrary to M.C.'s assertion, there was evidence showing S.S. was mentally defective under the statute. Schlesinger testified S.S.'s "[m]ental retardation is so significant, [and] so pervasive it affects every aspect of [her] functioning[,]" and renders her "dependent on other people," "emotionally weak," and "unable to stand up for herself and resist

33

almost anything." He opined that when M.C. and E.W. engaged in sexual activity with S.S., "[a]ny ability [S.S.] had to think or reason — any minimal ability that she may have had just completely shut down," resulting in an inability to assert her right to resist M.C. and E.W.'s actions.

In sum, Schlesinger opined that "at the time" of the sexual activity, S.S.'s "mental retardation" rendered her "incapable of understanding or exercising the right to refuse to engage in such conduct with another." Olivio, 123 N.J. at 564. Although there was evidence showing S.S. understood the sexual nature of the conduct and her right to refuse to engage in the conduct, M.C. argued at trial that S.S. consented to the sexual activity. Schlesinger's testimony, however, established S.S. was mentally defective because it showed that at the time of the sexual activity she was "incapable of . . . exercising that right [to consent], that is, whether [she] had the capacity to consent." State v. Cuni, 159 N.J. 584, 595-96 (1999) (internal citation omitted). The court did not err by denying M.C.'s motion for acquittal.

The court also did not err by adding to the model jury instruction on N.J.S.A. 2C:14-2(a)(7), Model Jury Charges (Criminal), "Aggravated Sexual Assault (Mentally Incapacitated) (N.J.S.A. 2C:14-2(a)(7)) (Offenses arising before March 17, 2012)"

(rev. Feb. 6, 2012), that in its determination of whether S.S. suffered from a mental defect,

> [t]he critical issue is [S.S.'s] capacity to consent in the sense that if she was unwilling to engage in the sexual acts at issue in this case, she had the mental and emotional ability to refuse. The inquiry, therefore, centers on [S.S.'s] mental condition and state of mind that would reflect that incapacity taking into consideration the facts as you find them to be when the sexual conduct occurred.

A jury must be properly instructed to ensure that a defendant receives a fair trial. State v. McKinney, 223 N.J. 475, 495 (2015) (citing State v. Afanador, 151 N.J. 41, 54 (1997)). A trial court must deliver "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Ibid. (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).

M.C. objected to the jury charge and, therefore, we apply the harmless error standard of review. State v. Baum, 224 N.J. 147, 159 (2016); see also R. 2:10-2. Under that standard, defendant must demonstrate "some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient enough to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Baum, 224 N.J. at 159 (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

When a challenge to a jury charge is raised on appeal, the charge must be read as a whole; we will not read just the portion alleged as error. State v. Delibero, 149 N.J. 90, 106 (1997). "[P]ortions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." State v. Gartland, 149 N.J. 456, 473 (1997) (alteration in original). We are required to consider "in the context of the entire case, whether the error was clearly capable of affecting the verdict or the sentence." State v. Bey, 129 N.J. 557, 624-25 (1992) (citation omitted).

The jury charge ought to serve as a "road map to guide the jury," State v. Martin, 119 N.J. 2, 15 (1990), and provide a precise, "comprehensible explanation of the questions that [it] must determine, including the law of the case applicable to the facts that [it] may find[,]" Green, 86 N.J. at 287-88. However, not every inaccuracy in jury charges warrants reversal. State v. Jordan, 147 N.J. 409, 422 (1997). Reversal should occur only where the error, considered in the context of the charge as a whole, "prejudicially affect[s] the substantial rights of the defendant sufficiently grievous[ly] to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Ibid. (quoting State v. Hock, 54 N.J. 526, 538 (1969)). These principles

36

arise from well-settled jurisprudence that a defendant is entitled to a fair trial, not a perfect one. See State v. Boiardo, 111 N.J. Super. 219, 233 (App. Div. 1970).

Applying these standards, we find no error in the court's instruction. The court defined the term mental defect in its recitation of the model jury charge, and the language the court added is in accordance with the Court's interpretation of the "mentally defective" element of a first-degree aggravated sexual assault under N.J.S.A. 2C:14-2(a)(7). Olivio, 123 N.J. at 553. A victim is mentally defective "if, at the time of the sexual activity, he or she is unable to comprehend the distinctively sexual nature of the conduct or is incapable of understanding or exercising the right to refuse to engage in such conduct with another." Ibid. The Court further observed that a mental defect is determined "in the context of the evidence that relates to the complainant's mental condition and conduct[,]" and directed that "[t]he trial court's instructions should inform the jury that the alleged victim's capacity to understand and consent to the proffered sexual conduct must be considered in the context of all of the surrounding circumstances in which it occurred." Id. at 568. That is precisely what the trial court did here.

During a pretrial hearing, defendants moved to bar the State from claiming the anal tear Kaiser discovered during her examination of S.S. showed S.S. was the victim of nonconsensual anal sex. Defendants asserted that, in the absence of expert testimony, there was no support in the evidence for such a claim. The court reserved decision on the request, but did not later directly address the issue or rule on the request.

However, during his summation the prosecutor referred to the evidence showing the anal tear and said the State "submits that [it] shows force and . . . backs up what [S.S.] is saying." The court overruled M.C.'s counsel's objection to the statement.

M.C. argues the prosecutor's argument was improper because there was no expert testimony supporting the assertion the anal tear was caused by nonconsensual anal sex, and the comment was not otherwise supported by the evidence. He claims the argument deprived him of a fair trial and requires a reversal of his convictions.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Cordero, 438 N.J. Super. 472, 489-90 (App. Div. 2014) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). "[I]n the prosecutor's effort to see that

justice is done, the prosecutor 'should not make inaccurate legal or factual assertions during a trial.'" State v. Bradshaw, 195 N.J. 493, 510 (2008) (quoting Frost, 158 N.J. at 85). "Rather, a prosecutor should 'confine [his or her] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence.'" Ibid. (alteration in original) (quoting State v. Smith, 167 N.J. 158, 178 (2001)). A prosecutor may make arguments "based on the facts of the case and reasonable inferences therefrom[.]" Smith, 167 N.J. at 178.

M.C. argues the prosecutor's comments were improper because in State v. Jones, 308 N.J. Super. 174, 183-84 (App. Div. 1998), we rejected a defendant's attempt to argue, in summation, that the absence of a broken hyoid bone in the victim's neck proved defendant's conduct was reckless rather than purposeful. Ibid. We affirmed the trial court's ruling barring the defendant's argument because there was no evidence concerning the hyoid bone and, therefore, any reference to it by defense counsel "exceeded the 'four corners' of the evidence." Id. at 185.

We further observed that the trial court barred the defendant's argument because it was premised on an inference that the absence of a broken hyoid bone showed "great pressure was not exerted" and, therefore, "there was a less degree of force applied than that which is purposeful or knowing." Id. at 184. We

39

determined defendant's argument "dealt with [a matter] 'so esoteric that jurors of common judgment and experience cannot' otherwise form a valid judgment as to the fact in issue without expert testimony." Id. at 185 (quoting Butler v. Acme Markets, Inc., 89 N.J. 270, 283 (1982)).

Here, unlike in Jones, there was evidence directly supporting the prosecutor's argument. Kaiser described "a tear approximately a quarter of an inch wide" and S.S. testified she was forcibly, anally sexually assaulted multiple times by two different men during the evening of January 31, 2011, and suffered anal pain following the assaults.

The prosecutor's argument, however, was not limited to the presence of the anal tear. Instead, he "submit[ted]" the tear provided confirmation that force was used, thereby requiring rejection of any conclusion, and defendant's contention, the anal intercourse was consensual. We are convinced that whether an anal tear demonstrates the use of force or otherwise is simply the byproduct of consensual anal sex is an issue that is sufficiently esoteric as to be beyond the common judgment and experience of jurors. See ibid.; see generally State v. Hyman, 451 N.J. Super. 429, 443 (App. Div. 2017) (quoting State v. Kelly, 97 N.J. 178, 208 (1984) (finding expert opinion testimony is required on subject matters "beyond the ken of the average juror")), certif. denied,

40

232 N.J. 301 (2018). The court, therefore, erred by overruling M.C.'s objection to the prosecutor's argument. The argument was not supported by the evidence.

Nonetheless, an "isolated comment[]" in summation, even if improper, does not constitute reversible error unless it "substantially prejudice[s] defendant's right to a fair trial." State v. Darrian, 255 N.J. Super. 435, 454 (App. Div. 1992). Remarks during a prosecutor's summation must be considered in context of the entire trial. State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991). That includes consideration of whether the remarks "were a measured response to defendant's summation made in an attempt to 'right the scale.'" State v. Murray, 338 N.J. Super. 80, 88 (App. Div. 2001) (quoting Engel, 249 N.J. Super. at 379).

"Whether particular prosecutorial efforts can be tolerated as vigorous advocacy or must be condemned as misconduct is often a difficult determination to make. In every instance, the performance must be evaluated in the context of the entire trial, the issues presented, and the general approaches employed." State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002). "To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate

41

the merits of his [or her] defense." State v. Nelson, 173 N.J.
417, 460 (2002) (alterations in original) (quoting State v.
Papasavvas, 163 N.J. 565, 625 (2000)).

We discern no basis to reverse M.C.'s conviction based on the
prosecutor's fleeting assertion the anal tear demonstrated S.S.
was forcibly anally sexually assaulted. There was other evidence
showing S.S. was forcibly sexually assaulted, including her
testimony that as she endured more than an hour of anal penetration
by the two defendants during which she repeatedly said "no" and
requested that they stop. Moreover, the prosecutor did not
misstate the evidence — there is no dispute S.S. had an anal tear
- but instead only made argument, stating he "submit[ted]" the
tear showed the use of force. The jury was properly instructed
the prosecutor's arguments did not constitute evidence and that
it was required to decide the case based solely on the evidence,
and law provided in the court's instructions. Again, we presume
the jury followed the court's instructions, Martini, 187 N.J. at
477, and, when considered in the context of the entire trial,
discern no basis to conclude the prosecutor's argument
substantially prejudiced M.C.'s right to a fair trial, Nelson, 173
N.J. at 460.

M.C. further contends the court erred by allowing Schlesinger to testify concerning whether S.S. had the capacity to consent to sexual activity under the circumstances presented because the issue was within the ken of jurors. He also argues Schlesinger was erroneously permitted to testify concerning the credibility of other trial witnesses.

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion, State v. Torres, 183 N.J. 554, 567 (2005), and will disturb a court's evidentiary decisions only when it commits "a clear error of judgment[,]" State v. Marrero, 148 N.J. 469, 483 (1997) (citation omitted).

N.J.R.E. 702 permits a witness who possesses "knowledge, skill, experience, training, or education" to offer expert opinion testimony where specialized knowledge will assist the jury "to understand the evidence or to determine a fact in issue." Testimony in the form of an expert opinion that is otherwise admissible is not objectionable even if it embraces an ultimate issue to be decided by the jury. N.J.R.E. 704. Experts are not permitted to offer an opinion on a defendant's guilt or innocence, and they should not use the statutory language defining the charged offenses, in order to avoid offering legal conclusions. State v. Odom, 116 N.J. 65, 77, 80 (1989).

N.J.R.E. 702 includes three requirements for the admission of expert testimony, which are interpreted liberally because of N.J.R.E. 702's inclination in favor of the admissibility of expert testimony. See State v. Rosales, 202 N.J. 549, 562 (2010). To be admissible

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Jenewicz, 193 N.J. 440, 454 (2008).]

Schlesinger, the State's expert in forensic psychology, properly testified concerning S.S.'s mental capacity under the circumstances presented on January 31, 2011. S.S. suffered from severe "[m]ental retardation," and the effect of the mental defect on her ability to "comprehend the distinctively sexual nature of the [sexual] conduct," and "understand[] or exercis[e] the right to refuse to engage in such conduct with another" at the time of sexual activity was a proper subject for expert testimony. See Olivio, 123 N.J. at 564. The effect S.S.'s mental defect had on her ability to consent was clearly beyond the understanding of persons of "ordinary experience, education and knowledge[,]" Odom, 116 N.J. at 71, and was a subject "so esoteric that jurors of common judgment and experience [could not] form a valid judgment"

44

in the absence of expert testimony, <u>Davis v. Brickman Landscaping, Ltd.</u>, 219 N.J. 395, 407 (2014) (quoting <u>Butler</u>, 89 N.J. at 283); <u>see, e.g.</u>, <u>Olivio</u>, 123 N.J. 553-56 (summarizing expert testimony concerning a sexual assault victim's mental defect). The court did not abuse its discretion by permitting Schlesinger to testify concerning S.S.'s mental defect and its effect on her ability to consent to the disputed sexual activity.

We further reject M.C.'s argument that the court erred by permitting Schlesinger to respond to the prosecutor's question as to how S.S.'s mental defect "impact[ed] her ability to say no in a situation where hypothetically . . . she is in a basement, a dark basement, with two people who are attempting to orally and anally penetrate her?" M.C. argues Schlesinger's response to the question, that S.S.'s mental defect rendered her "totally unable to exercise any of her rights not to consent" and "helpless" is barred by the Court's holding in <u>Cain</u> that an expert in a drug case may not offer an opinion in response to a hypothetical question concerning a defendant's intent because "an expert is no better qualified than a juror to determine the defendant's state of mind after the expert has given testimony on the peculiar characteristics of drug distribution that are beyond the juror's common understanding." 224 N.J. at 427. The Court determined that "such ultimate-issue testimony may be viewed as an expert's

quasi-pronouncement of guilt" in drug cases and usurp the jury's factfinding function. Ibid.

Unlike the issue of the defendant's intent to distribute drugs in Cain, the effect of S.S.'s mental defect on her ability to consent to sexual activity under the circumstances presented was an issue well beyond the ken of the average juror. It cannot be said, as it was in Cain, that the expert "is no[t] better qualified than a juror to determine" the effect of S.S.'s mental defect. See ibid. Nor can it be said Schlesinger offered an opinion on M.C.'s guilt or usurped the jury's factfinding role. To the contrary, he offered proper expert opinion on a subject about which the average juror could reasonably be expected to know little - the effect of S.S.'s mental defect on her abilities relevant under the Olivio standard. See Olivio, 123 N.J. at 564.

M.C. last argues he is entitled to a reversal of his convictions because during questioning by E.W.'s counsel, Schlesinger said B.S. and L.L. "seemed very credible to [him] and they were corroborated[,]" and characterized as "preposterous" V.B.'s testimony that S.S. did not protest during the alleged sexual assaults. M.C. did not object to E.W.'s counsel's questions or Schlesinger's responses. We therefore review his argument under the plain error standard. R. 2:10-2; Daniels, 182 N.J. at 95.

"The inclusion of testimony directed to the credibility of other witnesses is not permitted." State v. Terrell, 452 N.J. Super. 226, 250 (App. Div. 2016). It is the jury's role to determine witness credibility, State v. Vandeweaghe, 177 N.J. 229, 239 (2003), and an expert may not "be used to bolster a fact witness's 'testimony about straightforward, but disputed facts,'" Cain, 224 N.J. at 426-27 (quoting State v. McLean, 205 N.J. 438, 455 (2011)); see also State v. Henderson, 208 N.J. 208, 297 (2011).

It was error to permit Schlesinger to opine on the credibility of B.S., L.L. and a portion of V.B.'s version of the events. We do not, however, find plain error because the testimony was fleeting, and M.C.'s failure to object suggests he did not view the testimony as prejudicial. See State v. Krivacska, 341 N.J. Super. 1, 42-43 (App. Div. 2001) (concluding a trial court's failure to provide a limiting instruction was not plain error in part because the defendant's "failure to object signifie[d] that the error belatedly claimed was actually of no moment"). Moreover, B.S., L.L. and V.B. testified at trial, and the court instructed the jury on numerous occasions it had the exclusive responsibility to determine witness credibility. In addition, the court interrupted the prosecutor's redirect examination of Schlesinger, and directly instructed the jury that it was their duty, and not Schlesinger's, to make credibility determinations.

> Schlesinger does not have not firsthand knowledge of the evidence of what happened in this case. He's reviewed witness statements. He's reviewed other evidence in the case. There's been questioning on both sides of what he has taken into account and about credibility determinations that he's made. It's your job, not his, ultimately to make credibility determinations, to make determinations of what you believe based on the evidence you've heard what the facts are from the testimony and from the admissible evidence in the case. That's your job and based on the credibility decisions that you make and based on the facts that you determine about whether this testimony and these opinions are valid or not . . . .

We assume the jury followed the court's frequent and comprehensive instructions, State v. Loftin, 146 N.J. 295, 390 (1996), and do not find admission of the testimony "raise[s] a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached[,]" State v. Prall, 231 N.J. 567, 581 (2018) (second alteration in original) (quoting Daniels, 182 N.J. at 95).

## IV.

E.W. and M.C. make the same arguments challenging the court's imposition of sentence. At their separate sentencing proceedings, the court found multiple aggravating factors under N.J.S.A. 2C:44-1(a) supporting its imposition of defendants' sentences. Defendants, however, challenge only the court's finding of aggravating factor two, N.J.S.A. 2C:44-1(a)(2), the gravity and seriousness of the harm inflicted on the victim, including whether

the defendant know or reasonably should have known the victim "was

. . . substantially incapable of exercising normal physical or mental power of resistance[,]" and aggravating factor twelve, N.J.S.A. 2C:44-1(a)(12), the offense was committed against a person the defendant knew or should have known was disabled. Defendants also claim their sentences were excessive.[6]

Defendants contend the court based its finding of aggravating factors two and twelve on S.S.'s mental disability and, therefore the court engaged in impermissible double-counting. We agree.

We review a "trial court's 'sentencing determination under a deferential [abuse of discretion] standard of review.'" State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)); see also State v. Pierce, 188 N.J. 155, 169-70 (2006) ("On appellate review, the court will apply an abuse of discretion standard to the sentencing court's explanation for its sentencing decision within the entire range."). We affirm a sentence if: (1) the trial court followed the sentencing

---

[6] M.C. also argues the court erred by failing to find mitigating factors two, N.J.S.A. 2C:44-1(b)(2), the defendant did not contemplate causing serious harm, four, N.J.S.A. 2C:44-1(b)(4), there were substantial grounds excusing or justifying the defendant's conduct, and five, N.J.S.A. 2C:44-1(b)(5), the victim induced or facilitated the defendant's commission of the crimes. M.C. correctly notes the court did not make specific findings supporting its rejection of the mitigating factors, but our independent review of the record reveals no competent evidence or information supporting a finding of those factors.

guidelines; (2) its findings of fact and application of aggravating and mitigating factors were based on competent, credible evidence in the record; and (3) the application of the law to the facts does not "shock[] the judicial conscience." State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). When reviewing a trial court's sentencing decision, we will not "substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014) (citation omitted).

A court engages in impermissible double-counting when "elements of a crime for which a defendant is being sentenced" are "considered as aggravating circumstances in determining that sentence." State v. Kromphold, 162 N.J. 345, 353 (2000) (citing State v. Yarbough, 100 N.J. 627, 633 (1985)). A court may not "double count" a fact that established an element of the offense as a basis to support an aggravating or mitigating factor. Fuentes, 217 N.J. at 74-75; Kromphold, 162 N.J. at 353; Yarbough, 100 N.J. at 633.

"[A] sentencing court must scrupulously avoid 'double-counting' facts that establish the elements of the relevant offense." Fuentes, 217 N.J. at 74-75 (citing Yarbough, 100 N.J. at 645). A court, however, does not engage in double-counting when it considers facts showing defendant did more than the minimum

the State is required to prove to establish the elements of an offense. Id. at 75; see State v. Mara, 253 N.J. Super. 204, 214 (App. Div. 1992) ("The extent of the injuries, which exceed the statutory minimum for the offense, may be considered as aggravating.").

Here, the court cited S.S.'s mental disability, and relied upon it as a basis for finding aggravating factors two and twelve in imposing defendants' respective sentences. The court's reliance on S.S.'s disability, however, constituted impermissible double-counting supporting the sentences imposed on defendants' convictions for first-degree aggravated sexual assault under N.J.S.A. 2C:14-2(a). An element of the offense was that the victim "was mentally defective, or mentally incapacitated." See N.J.S.A. 2C:14-2(a) (2011). Thus, the court erred by counting a fact — S.S.'s mental disability — that established an element of the offense to support its finding of aggravating factors two and twelve. See Fuentes, 217 N.J. at 74-75; Kromphold, 162 N.J. at 353; Yarbough, 100 N.J. at 633. The court's finding of aggravating factors two and twelve did not constitute improper double-counting in its sentencing on the other charges for which defendants were convicted because S.S.'s mental defect or incapacity is not an element of any of those offenses.

We therefore are constrained to vacate defendants' respective sentences on the first-degree aggravated sexual assault charges under N.J.S.A. 2C:14-2(a)(7), and remand for resentencing on those charges only.[7]  See Fuentes, 217 N.J. at 70 (finding "[a]n appellate court may . . . remand for resentencing if the trial court considers an aggravating factor that is inappropriate to a particular defendant or to the offense at issue.").  We do not offer an opinion as to whether the record otherwise supports a finding of the aggravating factors based on information and evidence other than S.S.'s mental defect or incapacity, and leave that determination to the court on remand.

Defendants' argument that the sentences imposed on the other charges were excessive is without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).  We note only that, in imposing defendants' sentences on each of the other charges, the court did not violate the sentencing guidelines, fail to base its finding of aggravating and mitigating factors on competent and credible evidence or impose

---

[7]  E.W. was convicted and sentenced for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(7), under count four of the indictment.  M.C. was convicted and sentenced for the offense under count five.  The court's finding of aggravating factors two and twelve did not constitute improper double-counting in its sentencing on the other charges for which defendants were convicted, because S.S.'s mental defect or incapacity is not an element of any of those charges.

sentences that shock our judicial conscience.  See Fuentes, 217 N.J. at 70; Bolvito, 217 N.J. at 228.

In A-1148-15, we affirm E.W.'s convictions on all counts, affirm the sentences on counts one and two, vacate the sentence on count four and remand for resentencing on count four.  We do not retain jurisdiction.

In A-1137-15, we affirm M.C.'s convictions on all counts, affirm his sentence on count three, vacate the sentence on count five and remand for resentencing on count five.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION